147 F.3d 1137
 98 Cal. Daily Op. Serv. 5253, 98 Daily Journal
D.A.R. 7399,
98 Daily Journal D.A.R. 9486
Jonathan D. MAURO, Plaintiff-Appellant,
v.
Joseph M. ARPAIO, Sheriff; Maricopa County, a political
subdivision of the State of Arizona, Defendants-Appellees.
Arizona Civil Liberties Union, Intervenor.
 No. 97-16021.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 17, 1998.
Decided July 2, 1998.
As Amended Sept. 1, 1998.
 
 Nicholas S. Hentoff, Phoenix, Arizona, for plaintiff-appellant.
 Daniel P. Struck, Jones, Skelton & Hochuli, Phoenix, Arizona, for defendants-appellees.
 Appeal from the United States District Court for the District of Arizona; Robert C. Broomfield, District Judge, Presiding. D.C. No. CV-95-02729-RCB.
 Before: FLETCHER, D.W. NELSON and BEEZER, Circuit Judges.
 FLETCHER, Circuit Judge:
 
 
 1
 Jonathan Mauro appeals the district court's dismissal of his 42 U.S.C. § 1983 claim. The district court held that the Maricopa County prison system's policy prohibiting inmates from possessing "sexually explicit" materials does not violate the First Amendment. The County defines "sexually explicit" material as that containing any graphic representation of frontal nudity. The district court held that the policy was constitutional both as applied to Mauro's request for Playboy magazine and as applied to the receipt of any pictorial representations of frontal nudity. We have jurisdiction, 28 U.S.C. § 1291, and we reverse, holding that the policy is unconstitutionally overbroad.
 
 I.
 
 2
 In August 1993 Maricopa County adopted a policy prohibiting inmates from possessing "sexually explicit" materials. Appellant Jonathan Mauro, a pretrial detainee, sought to receive a subscription to Playboy while housed at one of Maricopa's prisons and was prevented from doing so.
 
 
 3
 The policy defines sexually explicit materials as "personal photographs, drawings, and magazines and pictorials that show frontal nudity." If a prisoner is found in possession of such items, they are confiscated and the prisoner is "written up" in a Disciplinary Action Report. The "mail officer" has the responsibility for determining whether a particular piece of incoming mail contains sexually explicit material. The position is rotated among detention staff. Thus, different persons on different days will determine whether a particular piece of mail will be withheld.
 
 
 4
 Maricopa County asserts that its policy was prompted by three considerations: safety, rehabilitation of inmates, and reduction of sexual harassment of female prison personnel. The County produced testimonial evidence that banning sexually explicit materials was necessary to achieve these goals. Affidavits or depositions were submitted from a number of female prison guards; from Larry Wendt, Deputy Chief of the Maricopa Custody Bureau; and from Joseph Arpaio, Sheriff of Maricopa County. In addition, defendants answered written interrogatories and submitted internal prison memoranda regarding the policy. Female guards noted that such materials were used to intimidate and harass them. The Deputy Chief stated that sexually explicit materials caused "a higher incident [sic] of inmate/officers assaults" and "hurt jail security." A written explanation of the regulation stated that the regulation was guided in part by a desire to insure rehabilitation since a substantial percentage of inmates have been convicted of sexual offenses.
 
 
 5
 After discovery, both parties moved for summary judgment. Mauro had claimed that the policy violated his rights under several provisions of both the United States and Arizona Constitutions, but both parties stipulated that his federal First Amendment claim would be dispositive. Addressing only the First Amendment issue, the district court granted summary judgment in the County's favor, holding that the policy, though broad, was reasonably related to legitimate penological interests. The district court assessed the regulation both as it applied to Playboy and as it applied to any depiction of frontal nudity.
 
 II.
 
 6
 We review de novo a grant of summary judgment. Forsyth v. Humana, Inc., 114 F.3d 1467, 1474 (9th Cir.), cert. denied, --- U.S. ----, 118 S.Ct. 559, 139 L.Ed.2d 401 (1997).
 
 
 7
 Mauro asserts that the regulation in question is unconstitutional as applied to his Playboy subscription and as applied to all materials that depict frontal nudity. The County avers that: (i) its policy does not concern materials protected by the First Amendment; (ii) Mauro cannot bring a facial challenge to the regulation, and (iii) even if Mauro could bring a facial challenge, the regulation is constitutional as applied to Playboy and as applied to any material depicting frontal nudity.
 
 A.
 
 8
 The regulation concerns more than just obscene materials, and thus purports to regulate material that is protected fully by the First Amendment. See Reno v. American Civil Liberties Union, --- U.S. ----, 117 S.Ct. 2329, 2347, 138 L.Ed.2d 874 (1997) (holding that sexual expression that is "indecent" is protected by the First Amendment); BSA, Inc. v. King County, 804 F.2d 1104, 1107 (9th Cir.1986) (holding that nudity alone is not enough to make material legally obscene).
 
 
 9
 Defendants assert that it is "doubtful" that the materials banned by its regulation even qualify as protected speech since the materials banned by the regulation "act as discriminatory conduct in the form of a hostile work environment." The County relies on Roberts v. U.S. Jaycees, 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984), in which the Supreme Court held that where "potentially expressive activities ... produce special harms distinct from their communicative impact, such practices are entitled to no constitutional protection." Id. at 628, 104 S.Ct. 3244. The Court noted, for example, that an act of violence that has an expressive component is not protected by the First Amendment merely because the act has that expressive component.
 
 
 10
 In Roberts, the Court upheld the application of a Minnesota statute prohibiting gender discrimination in places of public accommodation to the practices of the Jaycees. Club members, who adopted a policy that women could join their organization but could not vote on club matters, claimed that Minnesota's anti-discrimination statute violated their right to associate. The Supreme Court rejected that argument, holding that Minnesota could regulate the specialized harms that flowed from such discriminatory conduct, even if members' rights to associate were impinged in the process.
 
 
 11
 We disagree that Roberts should be applied to cases, like the instant case, that involve pure speech. The County has pointed to no case and we have found none in which any court has applied this "special harms" theory beyond the facts of Roberts or the cases that involve regulation of violent behavior. Roberts has been cited exclusively in cases with very similar facts, i.e., where the rights of social club members to associate with each other run afoul of anti-discrimination laws. We decline Maricopa's invitation to expand the application of Roberts.
 
 B.
 
 12
 Defendants next contend that Mauro is limited to challenging the regulation as it applies only to Playboy since Mauro conceded at deposition that he has tried only to receive a subscription to Playboy while in jail and his administrative grievance to jail authorities concerned only his Playboy subscription. Mauro may challenge the regulation as it relates to other materials only if he has standing to bring a facial overbreadth challenge to the regulation.
 
 
 13
 A facial overbreadth challenge may be brought to protect the First Amendment rights of those not before the court. The County correctly notes that the Supreme Court has held that "facial overbreadth adjudication is an exception to ... traditional rules of practice." Broadrick v. Oklahoma, 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). Broadrick describes a number of situations in which facial challenges are or are not appropriate. For example, a facial challenge is not appropriate when a plaintiff challenges an "ordinary criminal law." Id. at 613, 93 S.Ct. 2908. Also, when a statute regulates conduct that sometimes contains elements of expression, an overbreadth challenge is appropriate only when the overbreadth of a statute is real and substantial. Id. at 615, 93 S.Ct. 2908; see also United States v. Stansell, 847 F.2d 609, 613 (9th Cir.1988) (holding that "if a statute covers both conduct and speech ... the Supreme Court requires that 'the overbreadth of a statute must not only be real, but substantial as well' " (emphasis added)). On the other hand, facial challenges are particularly appropriate where a statute regulates "only spoken words," implicates the right of association, or acts as a prior restraint. Broadrick, 413 U.S. at 612-13, 93 S.Ct. 2908.
 
 
 14
 Maricopa County urges us to apply Broadrick to deny standing to Mauro to bring a facial challenge because Mauro has not shown that the regulation is substantially overbroad. The County contends that given the reality of prison life, it is "unlikely" that prisoners would request the type of art magazines and other materials that Mauro suggests would be banned by the regulation. First, we disagree that the regulation is not substantially overbroad. A wide variety of magazines and materials contain some frontal nudity, and pursuant to the regulation, inmates would be prevented from having any photograph, drawing or graphic that depicted frontal nudity. As noted by Mauro, this would include such magazines as National Geographic, medical journals, artistic works, and countless other materials. Second, although this is not a classic prior restraint case, as the regulation operates, inmates are prevented from receiving any materials that contain nudity, even those that cannot be legally withheld. If an overbreadth challenge is not allowed, inmates will be forced to endure an unending series of legal challenges to determine whether the regulation imposes a ban, piece of mail by piece of mail, while their First Amendment rights are put on hold. This is not a case in which the possibility is remote that parties not before the court would be punished for expressive conduct that is protected by the First Amendment. See, e.g., Regan v. Time, Inc., 468 U.S. 641, 650-51, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984) (noting that an overbreadth challenge was inappropriate where there existed a remote possibility that a statute would be applied to persons who were engaging in protected activity). Rather, this is a case in which materials will be withheld as a matter of course, forcing the inmates to bear the burden of uncertainty until more cases are litigated. We conclude that Mauro has standing to bring a facial challenge.
 
 C.
 
 15
 Prisoners do not lose their constitutional rights merely because they are incarcerated, although such freedoms are limited necessarily by the context of their surroundings. See Procunier v. Martinez, 416 U.S. 396, 409-13, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). In Turner v. Safley, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), the Supreme Court held that, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Id. at 89, 107 S.Ct. 2254. The Court recognized that while "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution," federal courts are " 'ill equipped to deal with the increasingly urgent problems of prison administration.' " Id. at 84, 107 S.Ct. 2254 (citing Procunier, 416 U.S. at 405-06, 94 S.Ct. 1800). The Court held further that there are four factors to be considered in assessing the reasonableness of a regulation: (i) whether there is a "valid, rational connection" between the regulation and the government interest put forth as justification and whether the purported interest is neutral; (ii) the extent to which alternative means of expression remain open to prisoners; (iii) what impact accommodation of the inmates' rights would have on guards, other inmates, and allocation of prison resources; and, (iv) the absence or presence of ready alternatives. Id. at 89-90, 107 S.Ct. 2254 (internal quotations omitted).
 
 
 16
 There were two regulations at issue in Turner. The first prohibited inmates from exchanging correspondence with each other. The Court upheld that regulation, holding that it was reasonably related to prison safety. The second prohibited an inmate from marrying without permission of the superintendent of the prison.[1] The Court struck the latter regulation, holding that it "swept much too broadly than can be explained by petitioners' penological interests," and that there were easy alternatives that would accommodate an inmate's right to marry while protecting prison security. Id. at 98, 107 S.Ct. 2254.
 
 
 17
 Two years after Turner was decided, the Supreme Court reviewed a prison regulation that prohibited prisoners from receiving certain sexually explicit materials, i.e., those containing images of homosexuality, sado-masochism, bestiality, and sexual situations involving children. Thornburgh v. Abbott, 490 U.S. 401, 405 n. 6, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989). In upholding the regulation, the Court held that prison regulations prohibiting inmates from receiving certain publications must be analyzed under the Turner reasonableness standard, and that the regulation satisfied the test. Id. at 413, 109 S.Ct. 1874.
 
 
 18
 Regardless of whether the County's policy would be constitutional if applied to ban Playboy magazine, it is not constitutional to ban all depictions of frontal nudity. There is no appropriate "limiting construction" that may be applied to save the constitutionality of the regulation. Accordingly, we hold that it must be struck as a whole.
 
 1.
 
 19
 The first Turner factor combines several inquiries. The government must establish that its justifications are legitimate and neutral and that there is a rational connection between the regulation and the justifications for that regulation.
 
 
 20
 Maricopa County claims three interests: safety, rehabilitation of inmates, and reduction of sexual harassment. Both the Supreme Court and this court have held that safety and rehabilitation are legitimate penological interests. See Witherow v. Paff, 52 F.3d 264, 265 (9th Cir.1995) (citing Procunier v. Martinez, 416 U.S. 396, 413, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974)). Although no court has addressed whether reducing sexual harassment of prison guards is a legitimate penological interest, there should be no doubt that protecting the safety of guards in general is a legitimate interest, and that reducing sexual harassment in particular likewise is legitimate. See, e.g., Folkerson v. Circus Circus Enters., Inc., 107 F.3d 754, 756 (9th Cir.1997) (holding that employer may be liable for failing to prevent sexual harassment of employee by co-workers and by private individuals, such as business patrons). We find Maricopa County's interests to be legitimate.
 
 
 21
 Neutrality has a specific meaning within the context of prison regulations. Neutrality means that:
 
 
 22
 the regulation or practice must further an important or substantial interest unrelated to the suppression of expression. Where ... prison administrators draw distinctions between publications solely on the basis of their potential implications for prison security, the regulations are 'neutral' in the technical sense in which we meant and used that term in Turner.
 
 
 23
 Thornburgh, 490 U.S. at 415-16, 109 S.Ct. 1874 (internal quotations and citations omitted); see also Giano v. Senkowski, 54 F.3d 1050, 1055 (2d Cir.1995) (holding that "even content-based First Amendment restrictions have been treated as neutral if their sole purpose is to maintain prison security and decrease violence among inmates"); Dawson v. Scurr, 986 F.2d 257, 261 (8th Cir.1993) (holding that prison regulations which "distinguish between publications on the basis of their potential implications for prison security and rehabilitation ... are 'neutral' ").
 
 
 24
 Here, the regulation purports to distinguish among incoming mail and publications based upon the materials' potential effect on prison safety, not based upon a certain message contained within that material. See, e.g., Harper v. Wallingford, 877 F.2d 728, 733 (9th Cir.1989) (holding that regulation could not ban materials for "merely advocating homosexual activity," but could ban those materials where they are shown to impact prison security). There is no evidence to the contrary. This is all that is required to meet the Turner neutrality test.
 
 
 25
 In demonstrating that a regulation is rationally related to a legitimate goal, prison officials need not prove that the banned material actually caused problems in the past, or that the materials are "likely" to cause problems in the future so long as there is an "intolerable risk" of violence. See Thornburgh, 490 U.S. at 417, 109 S.Ct. 1874 (so holding); Casey v. Lewis, 4 F.3d 1516, 1521 (9th Cir.1993) (holding that the court needs no proof that the banned materials had ever been the cause of violence in the past); Harper v. Wallingford, 877 F.2d 728, 733 (9th Cir.1989) (holding that prison need not demonstrate proof of actual danger). Rather, prison officials may anticipate problems and adopt regulations to forestall them. Casey, 4 F.3d at 1521 (citing Turner, 482 U.S. at 89, 107 S.Ct. 2254).
 
 
 26
 On the other hand, courts have not allowed prison officials to enact broad and far-reaching bans simply because safety or other legitimate interests were purported concerns. For example, as noted previously, the Court in Turner struck a prison regulation that prevented inmates from marrying "civilians." The Court noted, "the rule sweeps much more broadly than can be explained by petitioners' penological interests." Turner, 482 U.S. at 98, 107 S.Ct. 2254. The Court was concerned that prison officials' stated rationale was inconsistent with previous policy and not well supported by their own testimony. For example, there had been a long tradition of allowing such marriages, the rule had been unevenly enforced as applied to male and female inmates, and prison officials themselves had testified that they generally had no problem with inmate-civilian marriages. Id. at 99, 107 S.Ct. 2254.
 
 
 27
 In McCabe v. Arave, 827 F.2d 634 (9th Cir.1987), this court struck in part a prison regulation which prevented prisoners from receiving materials from the Church Jesus Christ Christian (CJCC). We held that while it was rational for the prison to ban those CJCC materials which specifically advocated violence, the prison could not ban CJCC materials which merely advocated racism, notwithstanding the prison's contention that racist materials are inflammatory and can lead to violence. Id. at 638. Some years later, in Stefanow v. McFadden, 103 F.3d 1466 (9th Cir.1996), assessing similar literature, we held that a ban is appropriate only when the material is "reasonably likely" to incite violence. Id. at 1473. In that case, we held that the book, Christianities Ancient Enemy, could be banned from the prison because it specifically advocated violence.
 
 
 28
 While the County presented evidence that magazines such as Playboy had been used in the past to harass female guards,[2] it offers no evidence of past incidents of violence or harassment where other materials depicting nudity were involved. Further, the sole evidence put forth of any potential for future danger was Deputy Chief Wendt's statement that it was his opinion that any material depicting nudity could be the focus of violence.
 
 
 29
 Although prison officials' opinions regarding security threats are owed deference, see Wallingford, 877 F.2d at 733, we question whether all materials depicting nudity are "reasonably likely" to be the cause of violence or a tool of harassment absent proof or reasoned explanation that this will result. The deposition of Wendt is the only evidence that Maricopa County offers to this effect, and Wendt offers no rationale for his supposition. After establishing that a photograph of a nude Christ painted by Michelangelo would be banned by Maricopa County's policy, Mauro's attorney asked Wendt the following:
 
 
 30
 Q. Do you believe that this photograph would in any way--the possession of this photograph would in any way impact upon jail security?
 
 
 31
 A. Yes, I do.
 
 
 32
 Q. Why?
 
 
 33
 A. There is a possibility that if in one cell you had an inmate or in the same cell you had an inmate who was an atheist and you had another inmate that was a devout Christian, and the atheist said something to the effect that look at the size of the genitals on Jesus Christ, that could incite a fight between the inmates.
 
 
 34
 Q. All right. Inmates can fight almost over anything, correct?
 
 
 35
 A. Correct.
 
 
 36
 Q. I mean, a picture of a clothed Christ could incite a riot, or incite a fight between two inmates?
 
 
 37
 A. It could.
 
 
 38
 Q. All right. But yet you don't ban a picture of a clothed Christ, do you?
 
 
 39
 A. I don't think it has the potion that a picture like this does.
 
 
 40
 Other than Wendt's testimony, Maricopa County merely states that the possibility that "inmates will misbehave when using materials depicting frontal nudity is clearly a reasonable possibility to which deference toward the policies of jail officials is required." The County offered no expert testimony, see, e.g., Wallingford, 877 F.2d at 733 (discussing affidavit of prison psychiatrist), nor even a "reasoned" explanation to support its theories, see, e.g., Casey v. Lewis, 4 F.3d 1516, 1521 (9th Cir.1993). At the same time, it imposed a prohibition that went far beyond any sanctioned by this court, or any other.[3] The County has not carried its burden to show that such a far reaching prohibition is "reasonably related" to legitimate penological interests. It offers no proof or reasoned explanation.
 
 2.
 
 41
 The second Turner factor concerns whether a regulation leaves open alternative means of expressing the right upon which the regulation impinges. See Thornburgh, 490 U.S. at 418, 109 S.Ct. 1874. The County's broad regulation fails this alternative means analysis.
 
 
 42
 The Supreme Court in Thornburgh provided useful guidance as to the application of this prong of the Turner test. In Thornburgh, the prison regulation prohibited any publication that was deemed by the warden to be "detrimental to the security, good order, or discipline of the institution or ... [that] might facilitate criminal activity." 490 U.S. at 416, 109 S.Ct. 1874. While the Court held that the alternative means test was satisfied because inmates retained access to "a broad range of publications," id. at 418, 109 S.Ct. 1874, the Court noted that the broader the regulation, the more likely that the regulation will violate the alternative means test. Id. at 417 n. 15, 109 S.Ct. 1874. The Court was "comforted" by the fact that "the regulations expressly rejected certain shortcuts," such as the creation of an excluded list of publications, or the delegation of the task of making an issue by issue determination to someone other than the warden himself. Id. at 417, 109 S.Ct. 1874. The Court noted that although this might mean that the regulation would at times be applied inconsistently, "[a]ny attempt to achieve greater consistency by broader exclusions might itself run afoul of the second Turner factor." Id. at 417 n. 15, 109 S.Ct. 1874.
 
 
 43
 The regulation here forbids any depiction of nudity. There is no issue by issue determination of whether a particular depiction of nudity might cause the unwanted consequences the prison seeks to avoid, nor does the warden have a nondelegable duty to make such an individualized determination. The blanket prohibition unnecessarily precludes prisoners' access to materials fully protected by the First Amendment. The County has not sought to ban a small subset of materials containing obscene of otherwise objectionable nudity while leaving open other means of viewing similar materials. See, e.g., Giano, 54 F.3d at 1056 (upholding the constitutionality of a prison regulation prohibiting the possession of nude or semi-nude photographs of loved ones because "commercially produced erotica and sexually graphic written notes from wives or girlfriends are adequate substitutes"); Dawson, 986 F.2d at 261 (upholding a regulation that banned certain sexually explicit material, such as child pornography, but that allowed inmates to "keep many sexually explicit materials in their cells"). Rather, in direct contradiction of the Supreme Court's cautionary language in Thornburgh, Maricopa County has enacted a regulation that sweeps too broadly, indiscriminately eliminating large categories of materials without individualized consideration.
 
 3.
 
 44
 The third factor weighs an inmate's request that his right be accommodated against the asserted impact that accommodating that right will have on other inmates and prison guards. See Thornburgh, 490 U.S. at 418, 109 S.Ct. 1874; Turner, 482 U.S. at 90, 107 S.Ct. 2254 (holding that "[i]n the necessarily closed environment of the correctional institution, few changes will have no ramifications on the liberty of others or on the use of the prison's limited resources for preserving institutional order"). Maricopa County has failed to address this issue except to insist that allowing inmates access to any depiction of frontal nudity would have a negative impact on jail security. We have rejected this broad claim, and in any event, have no need to address this factor, finding that the regulation fails to meet other prongs of the Turner test.
 
 4.
 
 45
 The availability of "obvious, easy" alternatives that could be implemented at a "de minimus" cost weigh against the reasonableness of a regulation. Turner, 482 U.S. at 93, 107 S.Ct. 2254. Mauro does not allege to this court that there are readily available alternative means of allowing him to view the materials he seeks to view. We have no ability nor need, then, to evaluate this prong of the Turner test.
 
 III.
 
 46
 Because we find that the regulation is overbroad, we must determine whether we can narrow the regulation in such a way as to insure its constitutionality. See Broadrick, 413 U.S. at 613, 93 S.Ct. 2908 ("Facial overbreadth has not been invoked when a limiting construction has been or could be placed on a challenged statute."); BSA, Inc. v. King County, 804 F.2d 1104, 1110 (9th Cir.1986) (holding that "the court must determine whether there is a 'readily apparent construction ... for rehabilitating the statute' " (citation omitted)).
 
 
 47
 Neither party has suggested an appropriate limiting construction, and we find that none exists. Maricopa has banned all depictions of frontal nudity. Such a broad restriction is not subject to an appropriate limiting construction and this court has neither the ability nor the power to fashion an entirely new regulation. See Reno v. American Civil Liberties Union, --- U.S. ----, 117 S.Ct. 2329, 2351, 138 L.Ed.2d 874 (1997) (holding that courts shall not "rewrite" laws to insure conformance with constitutional requirements, particularly in the absence of clear legislative intent indicating where "a new line or lines should be drawn," even where a severability clause exists). Further, plain and unambiguous regulations, such as the one in this case, are not susceptible to limiting constructions. See City of Houston v. Hill, 482 U.S. 451, 468, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987). As the Maricopa County prison regulation is overbroad and not subject to an appropriate limiting construction, we must strike it as a whole.
 
 IV.
 
 48
 Maricopa County's policy impinges upon the right of inmates to receive material protected by the First Amendment. It is overbroad and as such is unconstitutional. We REVERSE the district court and remand for proceedings not inconsistent with this decision. Mauro's request for reasonable attorney's fees pursuant to 42 U.S.C. § 1988(b), is granted. Defendant's request for costs pursuant to Fed. R.App. P. 39 is denied.
 
 
 49
 REVERSED and REMANDED.
 
 
 
 [1]
 Prison officials claimed that "love triangles" might lead to violent confrontations among inmates and that female inmates would often be better off if they were not involved in abusive marital relationships. Id. at 97, 107 S.Ct. 2254
 
 
 [2]
 Female guards stated, for example, that prisoners would hold up such magazines and make anatomical comparisons between them and the persons depicted in the magazines
 
 
 [3]
 Narrow prohibitions on certain types of materials have been upheld. See, e.g., Thornburgh, 490 U.S. at 405 n. 6, 109 S.Ct. 1874 (banning sexually explicit materials involving homosexuality, sado-masochism, bestiality, and children); Wallingford, 877 F.2d at 729 (banning material from the Man/Boy Love Association promoting sex with children); Giano, 54 F.3d at 1052 (banning nude or semi-nude photographs of inmates' wives or girlfriends); Dawson, 986 F.2d at 259 n. 2 (banning images of bestiality, sado-masochism, child nudity, and homosexuality)
 Maricopa has defined "sexually explicit" as any depiction of frontal nudity. Were the County to define it differently or more narrowly, we would have a different case.