

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-30-1999

# Waterman v. Farmer

Precedential or Non-Precedential:

Docket 98-6261

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Waterman v. Farmer" (1999). *1999 Decisions*. Paper 181.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/181

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed June 30, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-6261

RICHARD WATERMAN; MICHAEL CURTIS

v.

JOHN FARMER, JR., New Jersey Attorney General; JACK
TERHUNE, New Jersey Commissioner of Corrections;
WILLIAM PLANTIER, Superintendent of the Adult
Diagnostic & Treatment Center, individually and in their
official capacity,

      Appellants

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

(D.C. Civil No. 98-cv-1938)
District Judge: The Honorable Alfred M. Wolin

Argued: January 14, 1999

Before: NYGAARD, ALITO, and LEWIS, Circuit Judges

(Opinion Filed: June 30, 1999)

        Lawrence S. Lustberg (argued)
        Mark A. Berman
        Laura K. Abel
        Gibbons, Del Deo, Dolan, Griffinger
         & Vecchione
        One Riverfront Plaza
        Newark, NJ 07102-5497
        Attorney for Appellees

Peter Verniero
Ronald L. Bollheimer
Joseph L. Yannotti (argued)
Adrianna Calderon
Office of Attorney General
 of New Jersey
Richard J. Hughes Justice Complex
Trenton, NJ 08625
Attorneys for Appellants

Gregory J. Sullivan
3812 Quakerbridge Rd.
Hamilton, New Jersey 08619

Dennis J. Saffran
Center for the Community Interest
New York Regional Office
345 East 37th Street, Suite 303
New York, New York 10016
Attorneys for Amici Curiae Center
for the Community Interest,
Assemblyperson Marion Crecco, The
Friends of Amanda Foundation,
Voices for Victims, The Mark Klaas
Foundation for Children, Justice for
All, Protecting Our Children, and
Women Against Violence.

OPINION OF THE COURT

ALITO, Circuit Judge:

Two prisoners at a facility for sex offenders who have exhibited "repetitive and compulsive" behaviorfiled this lawsuit under 42 U.S.C. S 1983, alleging that a recently enacted New Jersey statute, N.J.S.A. 2C:47-10, violated their constitutional rights by restricting their access to pornographic materials. The District Court concluded that the statute was unconstitutional and permanently enjoined state officials from enforcing it. Waterman v. Verniero, 12 F.Supp.2d 378 (D.N.J. 1998). Subsequent to the District Court's decision, the state adopted regulations clarifying

2

the statute's scope. Informed by these regulations, we hold that the plaintiffs' constitutional challenge lacks merit, and we therefore reverse the decision of the District Court.

I.

Plaintiffs Richard Waterman and Michael Curtis are convicted pedophiles[1] incarcerated at the Adult Diagnostic and Treatment Center ("A.D.T.C.") in Avenel, New Jersey. The New Jersey Department of Corrections ("D.O.C.") operates the A.D.T.C. for the sole purpose of housing and rehabilitating sex offenders (i.e., pedophiles, child molesters, and rapists) who have exhibited behavior that is "repetitive and compulsive." Non-repetitive and non-compulsive sex offenders are housed in other institutions with the general prison population. The A.D.T.C. houses 750 inmates, approximately 70% of whom are pedophiles.

The A.D.T.C.'s therapeutic staff provides the inmates with intensive sex offender treatment, employing a four-step program that "is designed to present information and therapeutic experiences in a progressive order to ameliorate the offender's proclivity towards criminal sexual behavior." App. at 127. Each step focuses on concepts of victim empathy and the offender's sexual deviance. D.O.C. officials believe that this type of treatment can reduce recidivism.

In 1998, the New Jersey Assembly and Senate unanimously enacted a bill that banned "sexually oriented and obscene materials" from the A.D.T.C.[2] Governor

_____

1. Plaintiff Waterman is currently serving a 54-year prison sentence for sexually abusing a nine-year-old girl. Waterman has two previous convictions for pedophiliac offenses--one for abducting and raping an eleven-year-old girl and the other for fondling a nine-year-old girl.

Plaintiff Curtis is currently serving a 20-year sentence with 10 years of parole ineligibility for sexually abusing and taking nude photographs of a 14-year-old boy. Curtis also has a prior pedophiliac conviction: he received a sentence of probation for sexually assaulting a 15-year old boy.

2. Prior to 1998, A.D.T.C. officials had authority to prohibit inmates from possessing certain obscene publications pursuant to N.J.A.C. 10A:18-4.9(a)(6). However, before taking such action, officials had to find that

3

Whitman signed the bill into law. The statute reads as
follows:

> a. As used in this act, "sexually oriented material"
> means any description, narrative account, display, or
> depiction of sexual activity or associated anatomical
> area contained in, or consisting of, a picture or other
> representation, publication, sound recording, live
> performance, or film.

> b. An inmate sentenced to a period of confinement
> in the Adult Diagnostic Treatment Center shall not
> receive, possess, distribute or exhibit within the center
> sexually oriented material, as defined in subsection a.
> of this section. Upon the discovery of any such material
> within the center, the commissioner shall provide for
> its removal and destruction, subject to a departmental
> appeal procedure for the withholding or removal of
> such material from the inmate's possession.

> c. The commissioner shall request an inmate
> sentenced to confinement in the center to acknowledge
> in writing the requirements of this act prior to the
> enforcement of its provisions. Any inmate who violates
> the provisions of subsection b. of this section shall be
> subject to on-the-spot sanctions pursuant to rules and
> regulations adopted by the commissioner.

_____

> [t]he publication contains material which, based upon the
> experience and professional expertise of correctional
administrators
> and judged in the context of a correctional facility and its
> paramount interest in security, order and rehabilitation:

> i. Taken, as a whole, appeals to a prurient interest in sex;

> ii. Lacks, as a whole, serious literary, artistic, political or
scientific
> value; and

> iii. Depicts, in a patently offensive way, sexual conduct including
> patently offensive representations or descriptions of ultimate sex
> acts, masturbation, excretory functions, lewd exhibition of the
> genitals, sadism or masochism.

N.J.A.C. 10A:18-4.9(a)(6). This section still applies in New Jersey's
other
correctional facilities.

      d. A person who sells or offers for sale the material
      prohibited in subsection b. either for purposes of
      possession or viewing or who receives, possesses,
      distributes or exhibits any text, photograph, film, video
      or any other reproduction or reconstruction which
      depicts a person under 18 years of age engaging in a
      prohibited sexual act or in the simulation of such an
      act as defined in section 2 of P.L. 1992, c. 7 (C.2A:30B-
      2), within the center shall be considered to have
      committed an inmate prohibited act and be subject to
      sanctions pursuant to rules and regulations adopted
      by the commissioner.

N.J.S.A. 2C:47-10.

Plaintiffs filed this lawsuit pursuant to 42 U.S.C. S 1983,
alleging that the statute violated their constitutional rights.
They named as defendants Peter Verniero, then the
Attorney General of New Jersey;3 Jack Terhune,
Commissioner of the New Jersey Department of
Corrections; and William Plantier, Superintendent of the
A.D.T.C. (collectively, "Defendants").

The District Court preliminarily enjoined the enforcement
of N.J.S.A. 2C:47-10 pending a final determination
regarding the statute's constitutionality. Waterman v.
Verniero, 12 F.Supp.2d 364 (D.N.J. 1998) (Waterman I). The
District Court later concluded that the statute was
unconstitutional and permanently enjoined Defendants
from enforcing it. Waterman v. Verniero, 12 F.Supp.2d 378
(D.N.J. 1998) (Waterman II). Defendants appealed.

Several weeks after this case was argued on appeal,
counsel for Defendants advised the Court, pursuant to Fed.
R. App. P. 28(j), that New Jersey had promulgated
regulations implementing N.J.S.A. 2C:47-10. The
regulations significantly narrow the statute's scope by
defining many of the operative terms. The regulations
contain the following definitions:

      "Associated anatomical area" means exposed or
      unclothed genitalia or female breasts.

_____

3. John Farmer, Jr. has since replaced Peter Verniero as Attorney
General of New Jersey.

"Sexual activity" means actual or simulated ultimate sexual acts including sexual intercourse, oral sex, masturbation, or bestiality.

"Sexually oriented material" means a picture or other representation, publication, sound recording, live performance or film that contains a description or depiction of sexual activity or associated anatomical area, as these terms are herein defined.

N.J.A.C. 10A:18-9.1 (1999). The regulations also provide that "[m]aterials containing a depiction or description of sexual activity or an associated anatomical area shall not be considered `sexually oriented' unless the material is predominantly oriented to such depictions or descriptions." N.J.A.C. 10A:18-9.2(b). A publication is considered "predominantly oriented to the depiction or description of sexual activity or associated anatomical area" only if it "features or contains such descriptions or displays on a routine or regular basis or promotes itself based upon such depictions in the case of individual one-time issues." N.J.A.C. 10A:18-9.2(c).

The regulations prescribe the procedures that A.D.T.C. staff must follow when notifying inmates that a particular publication is prohibited by the statute. N.J.A.C. 10A:18-9.3. They also impose sanctions for violations of the statute, N.J.A.C. 10A:18-9.5, and exempt from regulation all materials deemed to serve a legitimate rehabilitative purpose, N.J.A.C. 10A:18-9.4.

II.

Defendants raise two arguments on appeal. First, they argue that the District Court erred in finding the statute unconstitutionally vague and overbroad. Second, they argue that the District Court erred in concluding that the statute is not rationally related to a legitimate penological interest. Because both of these arguments present questions of law, our review is plenary. See United States v. Various Computers & Computer Equip., 82 F.3d 582, 589 (3d Cir. 1996) ("Constitutional interpretations are questions of law subject to plenary review.").

6

A. Vagueness and Overbreadth

The District Court declared N.J.S.A. 2C:47-10 unconstitutionally vague[4] and overbroad.[5] In so doing, the Court noted that the statute was unconstitutional regardless of whether it was rationally related to a legitimate penological interest under Turner v. Safley, 482 U.S. 78 (1987). See Waterman II, 12 F.Supp.2d at 381 ("Although the Court need not address whether New Jersey had a valid penological interest when it passed N.J.S.A. 2C:47-10, it will briefly discuss the issue because the parties have hotly contested the issue and because the Court's analysis may aid the New Jersey Legislature if they decide to rewrite the statute.").

_____

4. A law or regulation can be deemed unconstitutionally vague if "men of common intelligence must necessarily guess at its meaning and differ as to its application. . . ." Connally v. General Constr. Co., 269 U.S. 385, 391 (1926). Although the vagueness doctrine was originally used to invalidate--on due process grounds--penal statutes that fail to "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited," Kolender v. Lawson, 461 U.S. 352, 357 (1983), courts frequently apply it in the First Amendment context.

The vagueness doctrine is similar--though not identical--to the doctrine of overbreadth. As with the overbreadth doctrine, a vagueness challenge can nullify an ambiguous law that "chills" protected First Amendment activities. But unlike the overbreadth doctrine, the vagueness doctrine was designed to guarantee "fair and non-discriminatory application of the laws, thus reflecting its roots in the due process clause." Kriemer v. Bureau of Police for the Town of Morristown, 958 F.2d 1242, 1266 (3d Cir. 1992).

5. A law or regulation is invalid on its face under the overbreadth doctrine if it "does not aim specifically at the evils within the allowable area of control [by the government] but . . . sweeps within its ambit other [constitutionally protected] activities." Thornill v. Alabama, 310 U.S. 88, 97 (1940). The overbreadth doctrine is an exception to conventional standing requirements. It provides that an individual whose conduct may be prohibited may challenge a regulation "because [that regulation] also threatens others not before the court--those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid." Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 503 (1985).

Defendants now argue that the District Court erred in concluding that it could declare the statute unconstitutional without first considering whether it was rationally related to a legitimate penological interest. We agree.

Constitutional challenges to laws, regulations, and policies governing prison management must be examined under the framework of Turner v. Safley, 482 U.S. 78 (1987). In Safley, the Supreme Court acknowledged that "courts are ill-equipped to deal with the increasingly urgent problems of prison administration and reform." Id. at 84 (internal quotations omitted). Accordingly, the Court set out "to formulate a [comprehensive] standard of review for prisoners' constitutional claims that is responsive both to the `policy of judicial complaints and [to] the need to protect constitutional rights.' " Id. (quoting Procunier v. Martinez, 416 U.S. 396, 406 (1974)). Because vagueness and overbreadth challenges embody "constitutional claims," they must be analyzed under the four-pronged test announced in Safley. See, e.g., Procunier v. Martinez, 416 U.S. 396 (1974) (analyzing plaintiffs' vagueness claims under an evolutionary precursor to the Safley test); Amatel v. Reno, 156 F.3d 192, 203 (D.C. Cir. 1998) (addressing plaintiffs' overbreadth claims under Safley ), cert. denied, 67 U.S.L.W. 3588 (U.S. June 24, 1999) (No. 98-1452); Mauro v. Arpaio, 147 F.3d 1137, 1140-1144 (9th Cir.) (analyzing plaintiffs' overbreadth claims under Safley ), withdrawn, 162 F.3d 547 (1998) (ordering rehearing en banc).

Furthermore, the substantial overlap between the Safley test and the doctrines of vagueness and overbreadth 6 suggests that the Supreme Court did not intend for those

_____

6. The Safley test takes into account many of the same factors considered under the doctrines of vagueness and overbreadth. As we explain in greater detail later in this opinion, see infra., section II.B.,
Safley requires courts to consider (1) whether a rational connection exists between the regulation and a neutral, legitimate government interest; (2) whether alternative means exist for inmates to exercise the constitutional right at issue; (3) what impact the accommodation of the right would have on inmates, prison personnel, and allocation of prison resources; and (4) whether obvious, easy alternatives exist. Safley, 482 U.S. at 89-91.

8

doctrines to apply with independent force in the prison-litigation context. It would therefore be both redundant and inconsistent with Safley to subject N.J.S.A. 2C:47-10 to an independent challenge under the doctrines of vagueness and overbreadth.7

For this reason, we need not address Plaintiffs' vagueness and overbreadth challenges separately. Instead, if the challenged statute withstands review under Safley, it does not violate the Constitution. See Safley, 482 U.S. at 89 ("[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.") The District Court erred in concluding otherwise.

B. Reasonable Relation to Legitimate Penological Interests

As the District Court correctly noted, prisoners "do not lose their constitutional rights when they become incarcerated, and free citizens do not lose their ability to `exercis[e] their own constitutional rights by reaching out to those on the inside.' " Waterman I, 12 F.Supp.2d. at 371 (quoting Thornburgh v. Abbott, 490 U.S. 401, 407 (1989)). Nevertheless, prisoners' constitutional rights are necessarily limited. Jones v. North Carolina Prisoners' Union, 433 U.S. 119, 125 (1977) ("The fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment, which are implicit in incarceration.").

In Safley, the Supreme Court explained that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. at 89. Safley directs courts to assess the overall reasonableness of such regulations by weighing four factors. "First, there must be a `valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it," and this connection must not be "so remote as to

_____

7. Counsel for Plaintiffs effectively conceded this point at oral argument.
Transcript of Oral Argument at 34 ("[T]he truth of the matter is that pretty conventional vagueness and overbreadth analysis are built into the four factors of [Safley].").

render the policy arbitrary or irrational." Id. at 89-90 (quoting Block v. Rutherford, 486 U.S. 576, 586 (1984)). Second, a court must consider whether inmates retain alternative means of exercising the circumscribed right. Id. at 90. Third, a court must take into account the costs that accommodating the right would impose on other inmates, guards, and prison resources generally. Id. And fourth, a court must consider whether there are alternatives to the regulation that "fully accommodate[ ] the prisoner's rights at de minimis cost to valid penological interests." Id. at 90-91. Although the factors are intended to serve as guides to a single reasonableness standard, "the first factor looms especially large" because it "tends to encompass the remaining factors, and some of its criteria are apparently necessary conditions." Amatel, 156 F.3d at 196.

1. Rational Connection to a Legitimate and Neutral
        Objective

Under the first prong of the Safley test, we must decide whether the statute bears a "valid, rational connection" to a legitimate and neutral governmental objective. Safley, 482 U.S. at 89-90 (quoting Block v. Rutherford, 468 U.S. at 586). Accordingly, we may conclude that the statute fails to satisfy this prong if the statute promotes an interest that is illegitimate or not neutral, or if the statute bears no "valid, rational connection" to the asserted interest. Id. at 89-90.

        a. Legitimacy

Defendants argue that the statute promotes the legitimate penological interest of rehabilitation. While the District Court acknowledged that "rehabilitation is a valid penological interest," it concluded that Defendants' explanation of the statute's purpose was pretextual and theorized that the statute was motivated more by an indignant animus toward sex offenders than a genuine attempt to rehabilitate them:

> New Jersey did not have a valid penological interest
> when it enacted N.J.S.A. 2C:47-10 because
> rehabilitation does not appear to be the true reason
> why the New Jersey Legislature passed N.J.S.A. 2C:47-
> 10. The legislative history does not mention

10

rehabilitation, and Dr. Nancy Graffin, the Director of Psychology at the ADTC, did not testify before either the Assembly or the Senate, and learned about the statute after it was enacted. Most importantly, the Department of Corrections formally opposed the statute before Governor Whitman signed it because the Department believed that adult pornography for inmates at the ADTC was a step in the right direction. Thus, the true reason for the enactment of N.J.S.A. 2C:47-10 appears to be public outrage over some of the heinous, pedophiliac crimes that occurred in New Jersey.

Waterman II, 12 F.Supp.2d at 381. Thus, the District Court treated the dearth of legislative history as conclusive proof that the "true" purpose of the statute was not to rehabilitate sex offenders, but instead to satisfy the widespread "public outrage over some of the heinous, pedophiliac crimes that occurred in New Jersey." Id. at 381.

This assessment cannot withstand review. The absence of legislative facts has no bearing on whether a statute's purpose is legitimate. Nordlinger v. Hahn, 505 U.S. 1, 15 (1992). Moreover, a time-honored principle of constitutional law reminds us that judicial second-guessing of a legislature's motives is "generally unwarranted" "absent some reason to infer antipathy." Vance v. Bradley, 440 U.S. 93, 97 (1979). Consequently, the fact that the statute's "legislative history does not mention rehabilitation" is irrelevant. As our en banc court emphasized in Phillips v. Borough of Keyport, 107 F.3d 164 (3d Cir. 1997):

> [t]here is a significant difference between the requirement that there be a factual basis for a legislative judgment presented in court when that judgment is challenged and a requirement that such a factual basis have been submitted to the legislative body prior to the enactment of the legislative measure. We have always required the former; we have never required the latter. Whatever level of scrutiny we have applied in a given case, we have always found it acceptable for individual legislators to base their judgments on their own study of the subject matter

11

> of the legislation, their communications with
> constituents, and their own life experience and
> common sense so long as they come forward with the
> required showing in the courtroom once a challenge is
> raised. . . . We perceive no justification in policy or
> doctrine for abandoning our traditional approach.
> Moreover, we believe that insistence on the creation of
> a legislative record is an unwarranted intrusion into
> the internal affairs of the legislative branch of
> governments.

Id. at 178.

In this case, it is beyond dispute that New Jersey has a legitimate penological interest in rehabilitating its most dangerous and compulsive sex offenders. See O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987) (recognizing rehabilitation as a "valid penological objective"); see also Waterman II, 12 F.Supp.2d at 381 ("[T]he Court recognizes that rehabilitation is a valid penological interest . . . ."). Seeing no reason to question Defendants' assertion that the statute serves the purpose of promoting the rehabilitative efforts of the A.D.T.C., we reject the District Court's conclusion that the statute's purpose is illegitimate.

### b. Neutrality

The District Court made no findings concerning the statute's neutrality. However, in Thornburgh v. Abbott, 490 U.S. 401 (1989), the Supreme Court made clear that Safley's "neutrality" requirement is met if the asserted interest is "unrelated to the suppression of expression." Id. at 415. As we have already explained, the statute's purpose is to enhance the A.D.T.C.'s efforts to rehabilitate New Jersey's most serious sex offenders. Because the state's interest in rehabilitation is "unrelated to the suppression of expression," we conclude that the statute's purpose is neutral for purposes of Safley.

### c. Means-End Fit

We may conclude that the statute bears no "valid, rational connection" to rehabilitation if "the logical connection between the [statute] and the asserted goal is so

12

remote as to render the policy arbitrary or irrational." Safley, 482 U.S. at 89-90. This standard is similar to rational-basis review, under which a statutory classification can be declared unconstitutional only where the relationship of the classification to its asserted goal is "so attenuated as to render the distinction arbitrary or irrational." Nordlinger, 505 U.S. at 11 (1992). See Amatel, 156 F.3d at 198-99 (D.C. Cir. 1998) ("[T]he similarity between Safley's phrasing and the language of rational basis review suggests to us that, as far as the means-end fit is concerned, Safley's standard is, if not identical, something very similar."). The legislature's judgment therefore need not be perfect, just rational.

During proceedings before the District Court, Defendants presented evidence that the statute bears a "valid, rational connection," Safley, 482 U.S. at 89-90, to the rehabilitation of sex offenders. They submitted affidavits from two psychologists--Dr. Nancy Graffin, Ph.D., and Dr. Timothy Foley, Ph.D.--both of whom testified that pornographic material threatened to thwart the effectiveness of the treatment given to A.D.T.C. inmates.

Dr. Graffin testified that throughout their treatment, A.D.T.C. inmates are required to develop an advanced understanding of the consequences of their sexual assaults and recognize cognitive distortions associated with their sexual abuse. App. at 125-29. She further explained that during the final treatment phase, inmates are required to demonstrate victim sensitivity and the ability to connect emotionally with others. Id. Finally, Dr. Graffin explained that sexually oriented material can be a threat to A.D.T.C. treatment because pornographic material tends to objectify the individuals depicted. Id.

Similarly, Dr. Foley testified that sexually explicit material could be harmful to A.D.T.C. inmates, reasoning that exposure to such material can lead the inmates to believe that intimacy can be achieved only through sexual release and that a victim is necessary for sexual enjoyment. App. at 135-140. He also concluded that pornography is particularly dangerous to A.D.T.C. inmates because some sex offenders tend to use such material to supply and fortify their fantasies and are likely to engage in a series of

13

"trial runs" of these fantasies once they are released from prison. Id.

In addition to the affidavits of Drs. Graffin and Foley, Defendants also referred the Court to "a considerable body of research supporting the view that the sexual material prohibited by the statute is harmful to prisoners and poses a danger to society when these sex offenders consume it." Br. for Appellants at 16, 31.

Nevertheless, the District Court concluded that the statute did not bear a "valid, rational connection" to a legitimate and neutral governmental objective. See Waterman II, 12 F.Supp.2d at 381. In so doing, the Court suggested that the lack of consensus among psychologists invalidated Defendants' contention that the statute enhanced the state's efforts to rehabilitate its most serious sex offenders. The Court wrote:

> After reviewing the experts' affidavits, the Courtfinds that the psychology field has not yet reached an agreement on how sexually oriented materials affect the treatment of sex offenders. Although the Court is not equipped to resolve that issue, it has determined that plaintiffs' experts are more convincing because their position is more reasonable. Given the disagreement in the psychology field on this issue, it seems most appropriate for psychologists to determine whether to use such materials on a case-by-case basis. On the other hand, flatly prohibiting such materials, as N.J.S.A. 2C:47-10 proposes to do, would deny certain sex offenders valuable treatment. Thus, N.J.S.A. 2C:47-10 actually diminishes New Jersey's purported interest in rehabilitation. The Court concludes that the statute is not rationally related to rehabilitation because plaintiffs' experts' recommendation that the materials be reviewed on a case-by-case basis is a better method for handling the materials than that provided by the statute and New Jersey's experts.

Id. at 382. Simply stated, the District Court based its conclusion on the fact that "[t]he experts in this case disagree on the effect that the materials will have on the treatment of the inmates at the A.D.T.C." Id. at 381; see

14

also id. at 382 ("The psychology field has not yet reached an agreement on how sexually oriented materials affect the treatment of sex offenders.").

Notably, the Court did not conclude that the opinions expressed by the Defendants' experts were irrational or unreasonable. Rather, the Court opined that the theories advanced by the Plaintiffs' experts were "better," "more convincing," and "more reasonable," id . at 382, thereby suggesting that the opinions expressed by the Defendants' experts were in fact reasonable, but simply less so than the Plaintiffs' experts' opinions.

The District Court applied the wrong standard, replacing the New Jersey legislature's policy decisions with its own "more reasonable" judgment. In so doing, the Court failed to accord the legislature's judgment the deference to which it is entitled.8 The appropriate question is not whether the theories advanced by either party's experts are"more reasonable" and "more convincing," but instead whether "the logical connection between the [statute] and the asserted goal" of improving the A.D.T.C.'s sex offender

_____

8. Two factors present in this case compel us to examine the New Jersey legislature's judgment deferentially. First, the statute governs the management of one of New Jersey's prisons. As the Supreme Court explained in Safley, determinations related to prison management are "peculiarly within the province of the legislative and executive branches of government," and must therefore be reviewed with a "policy of judicial restraint." Safley, 482 U.S. at 84–85 (internal citations and quotation marks omitted). That policy applies with even greater vigor here because "[w]here a state penal system is involved, federal courts have . . . additional reason to accord deference to the appropriate . . . authorities."
Id.

Second, in enacting N.J.S.A. 2C:47–10, the legislature has "undertake[n] to act in [an] area[ ] fraught with . . . scientific uncertainties." Marshall v. United States, 414 U.S. 417, 427 (1974). The Supreme Court has explained that in such circumstances, "legislative options must be especially broad and courts should be cautious not to rewrite legislation, even assuming arguendo, that judges with more direct exposure to the problem might make wiser choices." Id. at 427. Stated differently, courts are bound to give the legislature greater deference––not less––where the latter has "undertake[n] to act in [an] area[ ]" where "experts disagree." Id. at 427.

15

rehabilitation program is "so remote as to render the policy arbitrary or irrational." Safley, 482 U.S. at 89-90.

In a recent decision upholding a statute that effectively prohibits the distribution of sexually explicit material in federal prisons, the United States Court of Appeals for the District of Columbia Circuit acknowledged its deferential role under Safley. The Court explained that the legislative judgment underlying the challenged statute need not be perfect to be deemed rationally connected to a legitimate penological interest:

> The legislative judgment is that pornography adversely affects rehabilitation. It does not matter whether we agree with the legislature, only whether we find its judgment rational. The question for us is not whether the regulation in fact advances the government interest, only whether the legislature might reasonably have thought that it would.

Amatel, 156 F.3d at 199 (D.C. Cir. 1998).

We agree with the Amatel panel's analysis; as long as the statute is rational, it clears Safley'sfirst hurdle. Thus, Defendants need only demonstrate that "the [New Jersey] legislature might reasonably have thought that [the statute] would" advance the interest of rehabilitating the sex offenders housed at the A.D.T.C. Id. at 199.

We conclude that the Defendants made such a showing and that New Jersey "could rationally have seen a connection between pornography and rehabilitative values." Id. at 199. Many psychologists--Defendants' experts included--have expressed well-reasoned opinions supporting Defendants' argument that the statute will enhance the A.D.T.C.'s rehabilitative efforts. These opinions provide a sufficient basis for us to conclude that the statute bears a valid rational connection to a legitimate penological interest.

Moreover, "[c]ommon sense tells us that prisoners are more likely to develop the now-missing self-control and respect for others if prevented from poring over pictures that are themselves degrading and disrespectful." Id. at 199. Thus, even without the opinions of Defendants'

16

experts, we could conclude that New Jersey acted rationally in enacting N.J.S.A. 2C:47-10 because the theoretical underpinnings of the statute

> share[ ] at least a core with ideas that have a lineage of a few centuries, perhaps millennia, stressing the desirability of deferring sexual gratification, of sublimation of sexual impulses, of channeling sexual expression into long-term relationships of caring and affection, of joining eros to agape. The supposition that exclusion of pornography from prisons will have much of an impact in this direction may be optimistic, but it is not irrational.

Id. at 199.

Plaintiffs acknowledge that Amatel is "consistent with th[e] well-established line of cases" applying Safley. Br. for Appellees at 23. However, they attempt to distinguish Amatel by pointing out that the statute upheld in Amatel " `is not enforced directly,' " but is instead enforced pursuant to " `regulations defining the terms of the proscription and significantly narrowing its scope.' " Id. (quoting Amatel, 156 F.3d at 194).

Whatever force this argument carried prior to the issuance of the new implementing regulations, we see no basis for the argument now. As previously noted, New Jersey has now promulgated regulations "defining the terms of the proscription and significantly narrowing [the statute's] scope." Id. (quoting Amatel, 156 F.3d at 194); see N.J.A.C. 10A:18-9 (narrowing the operative terms of N.J.S.A. 2C:47-10). Thus, Plaintiffs' attempt to distinguish Amatel fails.9

_____

9. Plaintiffs liken N.J.S.A. 2C:47-10 to a prison regulation that was declared unconstitutional in Mauro v. Arpaio, 147 F.3d 1137 (9th Cir. 1998). However, the Ninth Circuit has withdrawn its opinion in that case pending rehearing en banc. See 162 F.3d 547 (1998).

But even if the Mauro opinion had not been withdrawn, it would not affect the outcome of this case. The Mauro panel's holding was based on the the defendants' failure to demonstrate that the regulation was reasonably related to a legitimate penological interest. As the panel noted, the defendants' evidence amounted to little more than a

17

We are satisfied that N.J.S.A. S 2C:47-10 bears a valid, rational connection to the legitimate penological interest put forward to justify it, and we hold that the District Court erred in concluding otherwise.

2. Alternative Means

The second factor requires us to assess the availability of alternative means of exercising the right at stake. For obvious reasons, this factor tends to favor plaintiffs where the alleged right is defined narrowly, and where the scope of the restriction is construed broadly. Thus, "if the `right' at stake is defined in terms of the materials excluded by the ban, any regulation will come up short." Amatel, 156 F.3d at 192.

Not surprisingly, Plaintiffs define the right narrowly, and read the statute broadly. Br. for Appellees at 44-45. While not commenting directly on the scope of the right, the District Court construed the statute broadly, finding that it "could potentially prohibit the inmates from reading or viewing many legitimate publications." Waterman I, 12 F.Supp.2d at 376. The Court feared that (1) "the word `any' ensures that the statute is overbroad because `any' mandates that no exceptions will be made to the statute" and (2) "the words `any associated anatomical area' appears to mean that every publication that contains a body part that is associated with sexual activity is banned." Id. According to the District Court, the statute could be read as allowing A.D.T.C. officials to prohibit everything from the Bible to legal publications. Id.

We find the District Court's analysis of this factor to be unreasonable and inconsistent with Thornburgh v. Abbott, 490 U.S. 401 (1989). In Thornburgh, the Court upheld a regulation that barred all "sexually explicit material which by its nature or content poses a threat to the security, good

_____

conclusory assertion that "inmates will misbehave when using materials depicting frontal nudity." Mauro, 147 F.3d at 1143. Unlike the defendants in Mauro, the Defendants before us--like the defendants in Amatel--have met their burden under Safley. Mauro is therefore distinguishable.

order, or discipline of the institution, or facilitates criminal activity." Id. at 405 n.5. The Court concluded that the second Safley factor was "clearly satisfied" because "the regulations permit a broad range of publications to be sent, received, and read." Id. at 418. Significantly, the Court saw no problem with the breadth or ambiguity of the regulation.

The Thornburgh Court also explained that the relevant right "must be viewed sensibly and expansively." Id. at 417. Here, it was not "sensible" for the District Court to conclude that the statute was broad enough to forbid prisoners from reading the Bible, legal publications, or other non-pornographic books. See Waterman I, 12 F.Supp.2d at 376 ("[T]he Court agrees with plaintiffs' argument that the statute prohibits them from reading the Bible, fashion magazines, books, and cases."). We therefore disagree with the District Court's conclusion and conclude that N.J.S.A. 2C:47-10 provides Plaintiffs with an alternative means of exercising their constitutional rights.

Even if we were otherwise inclined to reach the opposite conclusion, the recently promulgated regulations implementing the statute would foreclose any need for us to do so. As noted, the regulations significantly narrow the statute's broad scope by defining many of its operative terms, providing that

> "Associated anatomical area" means exposed or unclothed genitalia or female breasts.
>
> "Sexual activity" means actual or simulated ultimate sexual acts including sexual intercourse, oral sex, masturbation, or bestiality.
>
> "Sexually oriented material" means a picture or other representation, publication, sound recording, live performance or film that contains a description or depiction of sexual activity or associated anatomical area, as these terms are herein defined.10

_____

10. The regulations also explain that "[m]aterials containing a depiction or description of sexual activity or an associated anatomical area shall not be considered `sexually oriented' unless the material is predominantly oriented to such depictions or descriptions." N.J.A.C.

N.J.A.C. 10A:18–9.1 (1999). Thus, the regulations eliminate any concern that Plaintiffs will be left without alternative means of exercising their constitutional rights.

Accordingly, we conclude that N.J.S.A. 2C:47–10 satisfies Safley's second prong.

3. Impact of Accommodation on Prison
      Resources/Absence of Alternatives

Safley's third prong requires us to evaluate the adverse impact that accommodating the Plaintiffs' asserted rights would have "on guards and other inmates, and on the allocation of prison resources." Safley, 482 U.S. at 90. Similarly, the fourth prong requires us to determine whether there are alternatives that can accommodate the right "at de minimis costs to valid penological interests." Id. at 91. As the District Court noted before issuing the preliminary injunction, Defendants' "arguments on[the third and fourth] factors overlap." Waterman I, 12 F.Supp.2d at 375. We will therefore discuss them together.

The District Court declined to address Safley 's third and fourth prongs when issuing the permanent injunction, concluding that "the ruling that New Jersey does not have a legitimate penological interest renders those factors moot." Waterman II, 12 F.Supp.2d at 382 n.2. However, Plaintiffs maintain that reasonable alternatives are available and argue that the A.D.T.C. staff "could review incoming publications [on a case–by–case basis and selectively prohibit] materials [found to be] harmful to rehabilitation." Br. for Appellees at 46–47.

As the Supreme Court has acknowledged, Safley  does not impose a least–restrictive–alternative test. 492 U.S. at 90. Consequently, we need not conclude that no less restrictive alternatives are available. Id. Where accommodation of the asserted right would have a "ripple effect" on prison staff,

_____

10A:18–9.2(b). A publication is only considered"predominantly oriented to the depiction or description of sexual activity or associated anatomical
area" if it "features or contains such descriptions or displays on a routine or regular basis or promotes itself based upon such depictions in the case of individual one–time issues." N.J.A.C. 10A:18–9.2(c).

courts are encouraged to give particular deference to the informed discretion of corrections officials. Id. (internal quotations omitted).

Defendants maintain that no reasonable alternatives are available. They point out that, while some inmates might not be adversely affected by limited access to pornography, any limited distribution would have to be carried out on the basis of a case-by-case review. Such a review, Defendants argue, "would have to be specifically controlled and monitored by a qualified therapist, thereby causing an undue burden on a staff already inundated with sex offender cases." Br. for Appellants at 35. Defendants also assert that even if the A.D.T.C. were sufficiently staffed to enable it to conduct a case-by-case review, a limited distribution would be impossible to control since"prisoners are more than likely to pass their material to other prisoners." Id. at 36.

We agree. The costs of the case-by-case alternative proposed by Plaintiffs would be "far from de minimis." Amatel, 156 F.3d at 201 ("The most obvious alternative is a detailed prisoner-by-prisoner (and presumably publication-by-publication) sifting to determine whether a particular publication will harm the rehabilitation of a particular prisoner. The costs of this approach seem far from de minimis."). Moreover, any attempt to accommodate the Plaintiffs' asserted rights would have an unduly burdensome effect "on guards . . . and on the allocation of prison resources." Safley, 482 U.S. at 90.

In sum, having analyzed the statute under the four-pronged test announced in Safley, we conclude that N.J.S.A. 2C:47-10 is "reasonably related to legitimate penological interests," id. at 89, andfind that the District Court erred in concluding otherwise.

III. CONCLUSION

For the foregoing reasons, we reverse the decision of the District Court and remand for the entry of judgment in favor of the Defendants.

21

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit