# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE, : 
: 
: ID No. 2212003016
: 
v. : 
: 
: 
CRAIG REEVES, : 
: 
: 
Defendant. : 

Submitted: March 19, 2024
Decided:   May 17, 2024

## OPINION

Erik C. Towne, Deputy Attorney General, and Katherine J. Garrison, Deputy Attorney General, DEPARTMENT OF JUSTICE, Dover, Delaware, *Attorneys for the State of Delaware*.

John R. Garey, Esquire, JOHN R. GAREY, PA, Dover, Delaware, *Attorney for the Defendant*.

**Clark, R.J.**

The State charges Defendant Craig Reeves with stalking and numerous other crimes following his allegedly unwanted, persistent contacts with an alleged victim. Over approximately six months, the State alleges that he texted her, contacted her despite no contact orders, intimidated her, and physically harmed her.

Mr. Reeves moves to dismiss a single stalking charge, pretrial. In doing so, he raises an issue of first impression in Delaware – whether 11 *Del.C.* § 1312 (the "Statute" or "Section 1312") is facially unconstitutional because it is overbroad. Accordingly, the Court must evaluate the extent to which the Statute violates the First Amendment, as applicable to Delaware through the Fourteenth Amendment (hereinafter referred to as only the "First Amendment").

Mr. Reeves relies, in significant part, on the recent United States Supreme Court decision in *Counterman v. Colorado*.[1] In that decision, the Supreme Court overturned a stalking conviction under a Colorado statute that is substantially similar to Section 1312. The Supreme Court did so because Colorado's statute, like Delaware's, applies a negligent state of mind requirement to an attendant circumstance that constitutes an element of the offense – *the effect or result* of a stalking-defendant's actions (hereafter, the "result element").

In response, the State counters that Mr. Reeves' facial challenge is inappropriate for three principal reasons. First, the State contends that the Statute is facially valid because Section 1312 does not infringe upon a *substantial* amount of protected speech in comparison to the Statute's legitimate applications. Second, the State contends that the Statute is constitutional because the General Assembly defined the offense in a manner that makes prosecutions under it lawful under the speech integral to criminal conduct exception. Third, the State asserts that its focus at trial will only be on Mr. Reeves' *conduct,* rather than the content of his speech.

---

[1] 600 U.S. 66 (2023).

As explained below, Section 1312 permits a significant number of applications that violate the First Amendment because they criminalize the content of one's speech. In addition, attempts to prosecute a defendant under the Statute for threats that stem from the content of the defendant's speech are unconstitutional, post-*Counterman*.

On the other hand, the Statute permits a significant number of constitutional prosecutions that do not curtail speech and fit comfortably within the common and ordinary definition of stalking. When comparing the number of constitutional applications to the unconstitutional, the ratio is not lopsidedly in favor of the unconstitutional. As a result, the Statute's overbreadth does not render it facially invalid.

This decision does not resolve whether Mr. Reeves' stalking prosecution will be constitutional on an as-applied basis, however. Whether the State's prosecution of Mr. Reeves will violate the First Amendment will depend in large part on whether the State relies on the content of Mr. Reeves' messages and statements at trial to prove that he engaged in a course of conduct that amounted to stalking.

## I. BACKGROUND

The State alleges in Count I in the indictment that Mr. Reeves committed the crime of stalking as defined in Section 1312.[2] To provide context, the Court will first examine Count I alongside the Statute's text. Second, controlling and persuasive authority on overbreadth challenges is varied and, in some cases, unclear. For that reason, the Court will explain how the overbreadth doctrine is applied when

---

[2] On May 6, 2024, a grand jury reindicted Mr. Reeves and added an additional count of stalking, together with additional charges arising from his alleged conduct targeting the alleged victim from February 1, 2024, through March 1, 2024. The facial validity of the newly added stalking charge is addressed by this Opinion as well.

3

a statute, such as Section 1312, seeks to regulate both conduct *and* speech. Lastly, the Court will address facial versus as-applied challenges in the First Amendment context.

### A. The Allegations Against Mr. Reeves and Delaware's Stalking Statute

Mr. Reeves asks the Court to find Section 1312 facially invalid and to dismiss the charge against him before trial.[3] In a facial challenge to a statute, evidentiary context is irrelevant. As a result, while the Court is instructed by what the State alleges in the indictment, only the Statute's text controls the analysis.

For contextual background only, the arresting officer alleged in the probable cause affidavit that Mr. Reeves engaged in a course of conduct that amounted to stalking.[4] The stalking allegation detailed in the affidavit incorporates a wide swath of communications and conduct. Those components included the following: physical threats, physical violence, violations of no contact orders by repeated texts and phone calls, the commission of other crimes targeted at the alleged victim, and some references to the content of messages and statements made to the alleged victim.[5]

On June 5, 2023, a grand jury indicted Mr. Reeves for one count of stalking. It also indicted him for one count of falsely reporting an incident, one count of assault third degree, four counts of harassment, four counts of non-compliance with bond conditions, two counts of act of intimidation, five counts of breach of conditions of bond during commitment, and six counts of attempted breach of

---

[3] Def.'s Mot. to Dismiss ¶ 20.
[4] Aff. of Probable Cause ¶ 12.
[5] *Id.* ¶¶ 6–9.

conditions of bond during commitment.[6]  Combined, the State contends that Mr. Reeves targeted the alleged victim for approximately six months.[7]

Turning to the allegations in Count 1, Mr. Reeves allegedly stalked the alleged victim as follows:

Craig L. Reeves, on or between the 16th day of October, 2022, and 2nd day of April 2023 . . . did knowingly engage in a course of conduct directed at [the alleged victim], and the conduct was of a type which would cause a reasonable person to fear physical injury to herself or another person and/or suffer other significant mental anguish or distress that may, but does not necessarily, require medical or other professional treatment or counseling, and the defendant violated any other order prohibiting contact with said person.

The Statute, 11 *Del. C.* § 1312, is the basis for the charge.  It provides that:

[a] person is guilty of stalking when the person knowingly engages in *a course of conduct* directed at a specific person and that conduct would cause a reasonable person to: (1) [f]ear physical injury to himself or that of another person; or (2) [s]uffer other significant mental anguish or distress that may, but does not necessarily, require medical or other professional treatment or counseling.[8]

Section 1312 continues by defining "course of conduct" as follows:

3 or more separate incidents, including, but not limited to, acts in which the person directly, indirectly, or through third parties, by any action, method, or means, follows, monitors, observes, surveys, *threatens, or communicates to or about another*, or interferes with, jeopardizes, damages, or disrupts another's daily activities, property, employment, business, career, education, or medical care.[9]

---

[6] Mr. Reeves filed a separate motion seeking dismissal of the harassment charges based on the harassment statute's alleged vagueness and overbreadth.  In response to his motion to dismiss, the State voluntarily dismissed those charges.  That  motion is now moot.

[7] *See* State's Resp. to Mot. to Dismiss at 1 (stating that course of conduct underlying the stalking charge in Count I occurred between October 2, 2022, and April 2, 2023).

[8]  11 *Del. C*. § 1312(a)  (emphasis added).

[9] *Id.* at (e)(1).

As explained in the analysis section below, the Statute permits prosecutions that violate the First Amendment because it criminalizes the content of one's speech in some situations. Namely, an individual is guilty of stalking if he or she (1) "**threatens, or communicates to or about another**" on 3 or more separate occasions, (2) in a manner that would cause a reasonable person to fear for their safety or experience significant mental anguish or distress.[10] The prosecutions of threats require the fact finder in many circumstances to examine the content of threatening speech. Speech, after all, can be the major driver of a threat. In many other circumstances, threats can arise from an accused's conduct only, such as when an accused follows a victim, violates no contact orders, or trespasses on his or her property.

Apart from threats, the Statute also includes "communications to or about another" as a potential basis for an entire course of conduct. That language, on its face, raises significant potential First Amendment issues because there is nothing included in the Statute to limit the type of communications subject to prosecution.

Finally, the Statute includes the phrase "**including, but not limited to**" in its definition of course of conduct.[11] That expansive phrase increases the number of potential unconstitutional applications available under the Statute.[12]

## B. The First Amendment's Focus on Speech Content

The First Amendment prohibits the government's restriction of speech based on "its message, its ideas, its subject matter, or its content."[13] Accordingly, content-

---

[10] *Id.* at (a) (emphasis added).
[11] *Id.* (emphasis added).
[12] *Id.*
[13] *United States v. Alvarez*, 567 U.S. 709, 716 (2012) (quoting *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002).

based restrictions on speech are presumptively invalid.[14]  Furthermore, when the government restricts the content of speech in the limited circumstances where it may, it must do so by the least restrictive means available.[15]

A restriction on speech is content-based if it applies to speech because of the "topic discussed or the idea or message expressed."[16]  Stated differently, something is content-based if the restriction cannot be justified without referring to the content of the regulated speech.[17]

Despite these protections, the First Amendment does not provide for absolute freedom of self-expression.[18]  A state or the federal government may regulate speech or expressive conduct which "by [its] very utterance inflict[s] injury or tend[s] to incite an immediate breach of the peace."[19]  The U.S. Supreme Court has recognized several categories of speech that the government may regulate because of content, provided the government does not do so selectively or arbitrarily.[20]  Those categories include obscenity,[21] defamation,[22] fraud,[23] incitement,[24] fighting words,[25] true threats,[26] speech integral to criminal conduct,[27] and child pornography.[28]  According

---

[14] *Reed v. Town of Gilbert, Arizona*, 576 U.S. 155, 163 (2015).
[15] *ACLU v. Mukasey*, 534 F.3d 181, 190 (3d Cir. 2008).
[16] *Reed,* 576 U.S. at 163.
[17] *Id.*
[18] *See, e.g.*, *Gitlow v. People of State of New York*, 268 U.S. 652, 666 (1925); *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942).
[19] *Chaplinsky,* 315 U.S. at 572.
[20] *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 383–84 (1992) ("[T]he government may proscribe libel; but it may not make the further content discrimination of proscribing *only* libel critical of the government.").
[21] *Miller v. California*, 413 U.S. 15, 24 (1973).
[22] *New York Times v. Sullivan*, 376 U.S. 254 (1964).
[23] *Illinois ex rel. Madigan v. Telemarketing Assocs.*, 538 U.S. 600, 612 (2003).
[24] *Brandenburg v. Ohio*, 395 U.S. 444, 447–48 (1969).
[25] *Chaplinsky*, 315 U.S. at 574.
[26] *Virginia v. Black*, 538 U.S. 343, 359 (2003).
[27] *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949).
[28] *New York v. Ferber*, 458 U.S. 747, 764 (1982).

to the United States Supreme Court, these areas of speech are "of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality."[29]  For purposes of brevity, this Court will refer to these categories of speech as "enumerated categories" or the "enumerated exceptions."

Even these enumerated categories of speech enjoy significant First Amendment protection.  As an additional layer of protection of free speech, in addition to other protective measures, the Supreme Court has articulated varying heightened state of mind requirements that apply to the enumerated categories.[30]  Mr. Reeves focuses on the heightened state of mind requirement applicable to true threats to support his facial challenge.

## C.  The Overbreadth Doctrine

Mr. Reeves alleges that Section 1312 is overbroad.  A statute is unconstitutionally overbroad if its language does not specifically target the "evils within the allowable area of control by the government but . . . sweeps within its ambit other constitutionally protected activities."[31]  The overbreadth doctrine applies only in the First Amendment context, and a criminal statute cannot lawfully restrict speech or expressive conduct that does not fall within the ambit of an enumerated category.[32]  Accordingly, the test for overbreadth is whether the language of the

---

[29] *Chaplinsky*, 315 U.S. at 572.

[30] *See, e.g. Counterman*, 600 U.S. at 80–82 (articulating the state of mind requirements for the enumerated exceptions, which include intentional for incitement prosecutions, and recklessness for defamation).

[31] *U.S. v. Bond*, 581 F.3d 128, 138 (3d Cir. 2009) (quoting *Waterman v. Farmer*, 183 F.3d 208, 212 n. 5 (3d Cir. 1999).

[32] *See Lutz v. City of York, Pa.*, 899 F.2d 255, 270–71 (3d Cir. 1990) (recognizing that "the overbreadth doctrine has never been recognized outside the context of the First Amendment").

statute is so broad that it discourages normally protected speech or expressive conduct that the State has no right to regulate.[33]

As is often the case in constitutional law, decisional law provides seemingly contradictory guidance regarding what makes an overbroad law facially invalid. While earlier United States Supreme Court authority supported painting with a broader brush, more recent authority has significantly curtailed facial invalidation as a remedy for overbreadth. Now, the Court refers to facial relief as "strong medicine."[34] To that end, the Court has cautioned the lower courts to facially invalidate statues only sparingly and to instead examine First Amendment violations on a case-by-case basis whenever possible.[35] This guidance is consistent with the Delaware Supreme Court's recognition that Delaware courts should construe statutes constitutionally whenever possible.[36]

Relaxed standing requirements are another hallmark of overbreadth challenges. Normally, a person to whom a statute is *constitutionally applied* generally lacks standing to challenge its constitutionality.[37] That is because constitutional rights are generally personal in nature and cannot be asserted vicariously.[38] In the overbreadth context, however, the Supreme Court has created a limited exception to this general rule because "weighty countervailing policies" are

---

[33] *State v. Driscoll*, 193 N.W.2d 851, 854 (Wis. 1972).

[34] *U.S. v. Williams*, 553 U.S. 285, 293 (2008).

[35] *See, e.g., Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973) (observing that the overbreadth doctrine should be employed "sparingly and only as a last resort"); *U.S. v. Hansen*, 599 U.S. 762, 770 (2023) (noting that invalidation based upon overbreadth is not to be "casually employed").

[36] *See, e.g., Crumps v. State*, 285 A.3d 125, 2022 WL 4543823 (Del. 2022) (TABLE) (recognizing that in reviewing a statute for its constitutionality, "there is a strong presumption that a legislative act is constitutional"); *Hoover v. State*, 958 A.2d 816, 821 (Del. 2008) ("This court has a duty to read statutory language so as to avoid constitutional questionability and patent absurdity and to give its language its reasonable and suitable meaning.")

[37] *Broadrick*, 413 U.S. at 609.

[38] *Id.*

at play.[39]  Namely, a defendant can attack a statute based upon overbreadth even when the statute is not unlawfully applied to her.[40]  The Supreme Court relaxed the typical standing requirements in this context, because, in its words, the First Amendment requires "breathing space."[41]  Here, Mr. Reeves has standing to challenge Section 1312 on the basis of overbreadth without the need to demonstrate that it has been (or will be) unconstitutionally applied to him.

## II.  THE PARTIES' CONTENTIONS

Mr. Reeves contends that Section 1312 is overbroad because the Statute permits the State to prosecute individuals based upon the content of their speech in situations where no enumerated exception applies.[42]  He further contends more specifically that the Statute unconstitutionally criminalizes threats, which in many cases are prosecuted based upon the speech of an accused.[43]

In support of his argument, he focuses on three portions of the Statute.  First, he contends that the General Assembly's use of the phrase "including, but not limited to," within the definition of course of conduct places no limits on the State's ability to prosecute for the use of protected speech.[44]  Second, Mr. Reeves argues that the use of the word "threatens" in the definition of course of conduct violates the First Amendment unless it is read to apply to "true threats."[45]  To that end, he contends that the recent decision in *Counterman v. Colorado* makes any threat-based prosecution under Section 1312 invalid.[46]  Third, Mr. Reeves contends that the

---

[39] *Id.* at 611.

[40] *Id.* at 612 (quoting *Dombrowski v. Pfister*, 380 U.S. 479, 486 (1965)).

[41] *Id.* at 611.

[42] Def.'s Mot. to Dismiss ¶¶ 11–16.

[43] *Id.* ¶ 11.

[44] *Id.* ¶ 13.

[45] *Id.* ¶ 14.

[46] *Id.* ¶¶ 22–23. Mr. Reeves mistakenly characterizes the Statute as imposing strict liability and contends that because of that, it violates due process.  To the contrary, the Statute applies the perception of a reasonable person to the result element.  When liability is based upon the perception

10

Statute's reference to "communicates to or about" impermissibly criminalizes speech that falls within no enumerated exception.[47]

The State first counters Mr. Reeves' motion by asserting that it will only prosecute him for conduct and not speech based upon content.[48] In part, the State also counters Mr. Reeves' facial challenge with what is more properly considered an as-applied basis for prosecution – the speech integral to criminal conduct exception.[49] For that purpose, the State goes further by couching the entire Statute as one criminalizing speech integral to criminal conduct.[50] In further support of its argument, the State relies on a concurring opinion in the *Counterman* decision that posits that threatening language could be regulated under several alternative First Amendment exceptions.[51] The State also cites several cases from other jurisdictions that examined their stalking statutes.[52] In some of those cases, the courts denied First Amendment challenges based upon the speech integral to criminal conduct exception.[53]

Apart from relying on the speech integral to criminal conduct exception, the State also addressed the primary issue in the case. Namely, the State contends that Section 1312 remains facially valid because its impact on protected speech is not substantial.[54] In that vein, the State implicitly concedes that Section 1312 impairs

---

or judgment of the hypothetical "reasonable person," that is negligence. *See Elonis v. U.S.*, 575 U.S 723, 734 (2015) ("Having liability turn on whether a 'reasonable person' regards the communication as a threat— regardless of what the defendant thinks—reduces culpability on the all-important element of the crime to negligence."). A negligence-based prosecution may in certain instances be unconstitutional but is not strict liability.

[47] Def.'s Mot. to Dismiss ¶¶ 24–33.
[48] State's Suppl. Br. in Resp. to Mot. to Dismiss at 5 (noting that in Count 1, there is no mention of speech).
[49] State's Resp. to Def.'s Mot. to Dismiss at 9–10.
[50] *Id.*
[51] Tr. of Oral Argument at 11:4–18.
[52] State's Supp. Br. In Resp. to Def.'s Mot. to Dismiss at 3–4.
[53] *Id.* at 4; *see, e.g., State v. Hemmingway*, 825 N.W. 2d 303, 310 (Wis. Ct. App. 2012).
[54] State's Resp. to Def.'s Mot. to Dismiss at 13.

content-based speech and is overbroad. That said, it contends that the statute is not invalid because Section 1312 is not *substantially* overbroad.[55]

Finally, the State alternatively addresses Mr. Reeves' arguments regarding true threats prosecutions. While the State contends it will not rely on threats in its prosecution, it nevertheless addresses Mr. Reeves' argument head on by contending that, for purposes of prosecuting true threats, Section 1312 survives *Counterman's* holding.[56] Again, the *Counterman* decision holds that a true threats prosecution complies with the First Amendment only if the accused had at least a reckless state of mind as to the result element of the offense.[57] Negligence is insufficient.[58] In this case, the State asserts that Section 1312 survives a *Counterman* challenge because the Statute applies the state of mind of knowingly to another element of the offense.[59] Given that, the State contends that knowingly, a higher state of mind than recklessness, applies throughout the Statute, including to Section 1312's result element.[60]

To more specifically parry Mr. Reeves' contention regarding *Counterman's* impact on Section 1312, the State relies on 11 *Del. C.* § 252 ("Section 252"). Section 252 provides:

> [w]hen a statute defining an offense prescribes the state of mind that is sufficient for the commission of the offense, without distinguishing among the elements thereof, the provision shall apply to all the elements of the offense, unless a contrary legislative purpose plainly appears.

Accordingly, the parties' arguments regarding *Counterman,* at least as to Section 1312's application to true threats, frame the following issue: whether the state of

---

[55] *Id.*
[56] *Id.* at 14.
[57] *See Counterman,* 600 U.S. at 82 (holding that the criminalization of true threats requires a minimum subjective mental state of recklessness to avoid running afoul of the First Amendment).
[58] *Id.*
[59] State's Suppl. Resp. to Def.'s Mot. to Dismiss at 14.
[60] *Id.*

12

mind element of knowingly, that applies to a defendant's acts, should be superimposed on the result element of the crime. In other words, the Court must determine whether the state of mind of knowingly applies to the result element even though the Statute applies a negligent state of mind to the result element.

## III.   ANALYSIS

The Statute contains a broad definition of course of conduct which, in turn, criminalizes both conduct and speech. More particularly, Section 1312 defines stalking in a way that criminalizes (1) speech based upon its content, (2) speech based upon the mere *act* of communicating, (3) conduct devoid of speech, and (4) the potential combination of all three.

Here, the State contends that the Court should deny Mr. Reeves' facial challenge because the Statute falls completely within the speech integral to criminal conduct exception. Mr. Reeves, for his part, contends that Section 1312 is invalid, in its entirety, because it criminalizes true threats in a way that violates *Counterman*'s holding, and further criminalizes speech that does not fall within any enumerated exception. As explained below, both parties are correct, but only in part. Namely, there are potential constitutional applications of the Statute that fall within the speech integral to criminal conduct exception. Furthermore, the Statute unconstitutionally permits prosecutions for threats that arise from the content of speech, whether it be merely by threats or "true threats." Both parties are incorrect, however, when contending that one or the other of these enumerated exceptions serve as a litmus test for Section 1312's validity.

To be more precise, the result of this facial challenge turns on three inquiries. First, the Court must examine Section 1312 as a whole to determine if it criminalizes the content of speech. If it does, as a second step, the Court must evaluate the extent

13

to which the Statute criminalizes speech versus conduct. Third and finally, the Court must compare the number of unconstitutional applications to the number of constitutional applications to determine if there is substantial overbreadth. Although a statute may be overbroad, it becomes *facially invalid* only if its unconstitutional applications are substantially out of proportion to its legitimate applications.[61] As explained below, the combined potential applications of Section 1312 net a ratio that is not lopsidedly unconstitutional. For that reason, the Statute, although overbroad, is not facially invalid.

In answering what the Court interprets as an alternative argument by Mr. Reeves, the Court has also considered whether the phrase "threatens, communicates to or about" (hereinafter the "primary offending provision") should be severed through judicial revision. That provision, which combines threats and communications, allows most of the Statute's unconstitutional applications based upon overbreadth. Striking one provision from the Statute, however, would be inappropriate because the Statute is facially valid when viewed as a whole.

Separately, severing the primary offending provision would be inappropriate. Section 1312 permits a wide swath of stalking-central constitutional prosecutions. The General Assembly would not have likely enacted the law without it. It is such a necessary centerpiece to the Statute that excising it would leave the Statute vague and unworkable in its absence.

Ultimately, the answer as to whether the State's stalking prosecution of Mr. Reeves is constitutional must await the presentation of evidence at trial, or a decision prior to trial following a motion i*n limine.* As explained below, the Court cannot

---

[61] *Broadrick*, 413 U.S. at 615 ("the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep"); *Hansen*, 599 U.S. at 770 ("To justify invalidation, a law's unconstitutional applications must be realistic, not fanciful, and their number must be substantially disproportionate to the statute's lawful sweep. In the absence of a lopsided ratio, courts must handle unconstitutional applications as they usually do case-by-case.").

determine whether the State's prosecution of Mr. Reeves for stalking will be constitutional on an as-applied basis without further evidentiary context.

### A. The State advocates an overly broad interpretation of the speech integral to criminal conduct exception; there may be applications of Section 1312, however, that fall under the exception on a case-by-case basis.

The Court addresses the speech integral to criminal conduct exception first because the State relies upon it, in part, to counter Mr. Reeves' facial challenge. In broad terms, the State seeks to characterize Section 1312 as falling under that exception in its entirety. Along that same vein, the State contends that the Court need not examine the Statute in the light of *Counterman* because true threats are not at issue in Mr. Reeves' case.[62] To this end, the State relies on a concurring opinion in the *Counterman* decision where the author posited that other exceptions, including speech integral to criminal conduct, could have made the prosecution in *Counterman* lawful.[63]

As an overview, the speech integral to criminal conduct exception is not as broad as the State contends. Nor is it an antidote, in and of itself, to Mr. Reeves' facial challenge. Typically, this exception has been limited to criminal conduct such as bribery, extortion, conspiracy, or the solicitation of others to commit *a separate crime*.[64] For example, there is no First Amendment violation when the government

---

[62] Tr. of Oral Argument at 10:8–19.

[63] *Id.* at 11:4–18; *see Counterman*, 600 U.S. at 84 (noting that threatening statements may be characterized as true threats in certain contexts, but may also fall into another exception, such as speech integral to criminal conduct, which makes the threat constitutionally proscribable) (Sotomayor, J., concurring).

[64] *See, e.g. Giboney*, 336 U.S. 498 (antitrust conspiracy); *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rel.*, 413 U.S. 376, 388 (1973) (solicitation of unlawful employment); *Williams*, 553 U.S. at 297 (offering to distribute child pornography); *Hansen*, 599 U.S. at 783 (solicitation or facilitation of illegal immigration); *U.S. v. Petrovic*, 701 F.3d 849, 855 (8th Cir. 2012) (extortion); *U.S. v. Osinger*, 753 F.3d 939, 941, 947 (9th Cir. 2014) (in-person harassment).

prosecutes a defendant based upon a statement such as "pay me money, or I will report you for a crime." Nor is there First Amendment protection for a defendant's statement to a law enforcement officer offering money to avoid arrest. The speech in those examples is integral to criminal conduct in the same way as is speech used to extort or solicit another to commit a crime. Such speech deserves no First Amendment protection.

The State argues for a broader reading of this exception and cites extra jurisdictional decisions to support its position. Some courts have incorrectly used this exception to rationalize upholding a statute that criminalizes speech. They have done so, absent the presence of any other enumerated exception, simply because their legislature passed a law labeling it criminal. The limited line of United States Supreme Court cases that have addressed this exception in no way supports such a broad reading.

First, in *Giboney v. Empire Storage & Ice Co*., the Supreme Court explained that, "[i]t rarely has been suggested that the constitutional freedom for speech and press extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute."[65] There, the Court examined speech by a defendant used solely to solicit another to violate the law.[66] Nothing in the *Giboney* decision supports broadening this exception to permit a legislature to define all speech as criminal.

After *Giboney*, the Supreme Court revisited the exception in *United States. v. Williams*.[67] There, the Court considered a First Amendment challenge to a statute that criminalized a defendant's offer to distribute illegal child pornography.[68] In

---

[65] *Giboney*, 336 U.S. at 498.
[66] *Id.*
[67] 553 U.S. 285 (2008).
[68] *Id.* at 288.

16

*Williams*, the Court held that, "[o]ffers to engage in illegal transactions are categorically excluded from First Amendment protection."[69]

Then, more recently, in *U.S. v. Hansen*,[70] the Supreme Court applied the speech integral to criminal conduct exception while explaining that speech intended to bring about a particular unlawful act has no social value and is, therefore, unprotected.[71]   Once again, *Hansen* fits within the historical pattern for this exception by applying it to the solicitation of *another crime*:  an immigration law violation.[72]   All of the limited mandatory precedent applying this exception relies on one constant:  the requirement that the speech be necessary to the commission of a totally separate crime.

The State did not fully explain its position regarding how Section 1312 could be considered a statute that criminalizes only speech integral to criminal conduct. Rather, it stresses that the General Assembly included *speech and conduct* within the definition of *course of conduct*.   In that way, the State seems to contend that speech becomes conduct simply because the General Assembly defined it as such, thus ending the inquiry.

Several courts and commentators have recognized the difficulty of interpreting this exception so broadly because of the circularity of reasoning required to do so.[73]

---

[69] *Id.* at 297.

[70] 599 U.S. 762 (2023).

[71] *Id.* at 783.

[72] *See Id.* (characterizing speech which solicits or facilitates illegal immigration as speech integral to criminal conduct).

[73] *See, e.g., U.S. v. Matusiewicz*, 84 F. Supp. 3d 363, 369 (D. Del. 2015) ("[I]t is important that [the court] avoid interpreting *Giboney's* exception too broadly. Under the broadest interpretation, if the government criminalized any type of speech, then anyone engaging in that speech could be punished because the speech would automatically be integral to committing the offense. That interpretation would clearly be inconsistent with the First Amendment[.]"); *see also* Eugene Volokh, *The "Speech Integral to Criminal Conduct" Exception*, 101 Cornell L. Rev. 981, 1036 (2016) (arguing that it is inappropriate to apply *Giboney* to harassment and stalking statutes which allow speech to be criminalized based upon its offensive nature to its recipient, when speech that

For instance, the United States Court of Appeals for the Eight Circuit explained the pitfalls of such an application in *U.S. v. Sryniawski*,[74] The Eight Circuit then addressed the need to limit the exception as follows:

> Congress may not define speech as a crime, and then render the speech unprotected by the First Amendment merely because it is integral to speech that Congress has criminalized. To qualify as speech integral to criminal conduct, the speech must be integral to conduct that constitutes *another offense and that does not involve protected speech*.[75]"

As recognized by the Eight Circuit, were this Court to accept such an interpretation of this enumerated category, a legislature could define any type of speech as unlawful and supersede the First Amendment. That would be the antithesis to constitutional primacy over statutory law. It would permit mere statutes to swallow the First Amendment.

In *Mashaud v. Boone*,[76] the District of Colombia Court of Appeals similarly rejected the argument that the District of Columbia's stalking statute permissibly curtailed speech "because it was integral to a criminal act— namely, stalking."[77] There, the court characterized the argument as "fatally circular" and noted that, "[w]hile it is true that the First Amendment does not protect speech integral to criminal conduct, the speech must be integral to conduct that constitutes *another offense* that does not involve speech."[78]

The State identifies case law in several states that have upheld *applications*

---

is "intended to annoy, offend, or distress does not help cause or threaten other crimes, the way solicitation or aiding or abetting does.").

[74] 48 F. 4th 583 (8th Cir. 2022).

[75] *Id.* at 588; *see also Giboney*, 336 U.S. at 498 (antitrust conspiracy); *U.S. v. Petrovic*, 701 F.3d 849, 855 (8th Cir. 2012) (extortion); *U.S. v. Osinger*, 753 F.3d 939, 941, 947 (9th Cir. 2014) (harassment).

[76] 295 A.3d 1139 (D.C. App. Ct. 2023).

[77] *Id.* at 1170.

[78] *Id.* at 1170–71.

of their statutes on the basis that the speech proscribed by the statute was speech integral to criminal conduct. For instance, in *State v. Labbe*,[79] the Supreme Court of Maine examined the validity of Maine's stalking statute in light of *Counterman*.[80] The *Labbe* court found that based upon the facts of that specific case, it was the defendant's "actions, not his words, that constituted the 'course of conduct' for which he was convicted and which cause the victim to suffer serious inconvenience and emotional distress."[81] The Maine court also opined that some of the phone calls made by the defendant and directed toward the victim in *Labbe* were not really speech at all.[82] Many of the calls were non-communicative because they consisted of the defendant's repeated calls and hang ups, leaving dead air, and breathing into the phone.[83] The *Labbe* decision, although couched as a facial challenge, came after trial and more appropriately involved an as-applied analysis. Some court decisions, such as the Maine court in *Labbe*, have incorrectly blurred the difference.[84]

The State also relies on *State v. Hemmingway*,[85] where the Court of Appeals of Wisconsin held that because a defendant's speech was "incidental to and evidence of his intent to engage in a course of conduct that he knew or should have known would instill fear of violence in [the victim,] such stalking conduct does not trigger First Amendment scrutiny or protection."[86] In essence, the Wisconsin court found valid a state legislature's statutory override of First Amendment protection simply because it labeled speech as criminal conduct. As in *Labbe*, the Wisconsin court in

---

[79] 2023 WL 9473676 (Me. Dec. 5, 2023).

[80] *Id.* at *11–14.

[81] *Id.* at *13.

[82] *Id.*

[83] *Id.*

[84] *See, e.g. Peterson v. State*, 930 P.2d 414, 429 (Alaska Ct. App. 1996) (considering whether the conduct of the defendants appealing the statute's validity was part of the "core of the definition of stalking" in its overbreadth analysis).

[85] 825 N.W. 2d 303 (Wis. App. Ct. 2012).

[86] *Id.* at 310.

*Hemmingway* applied the facts of an individual case developed after trial, while couching its decision as a facial one.[87]    The authority cited by the State is unpersuasive because this exception does not properly permit a state legislature unrestricted license to define speech as criminal by redefining it as conduct.

Moreover, the same cases relied upon by the State often examined state statutes with material differences from Section 1312.  Most were authored years before *Counterman*.  Despite their reasoning relying on the speech integral to criminal conduct exception, some involved prosecutions inescapably based upon threatening speech.[88]  As such, they incorrectly framed the issue as one involving speech integral to criminal conduct.  Moreover, most of the statutes in the cases relied upon by the State meet or exceed the requirements imposed by *Counterman*.  To this point, many require an accused to have either intended, known of, or recklessly disregarded the result of the defendant's actions.[89]  This distinction is

---

[87] *Id.* at 310.

[88] *See Hemmingway*, 825 N.W. 2d 303, at 305 (defendant's communications with the victim included threats to "blow his brains out," and comments "that he would love to see someone holding a gun to her and for her to be begging for her life"); *State v. B.A*, 205 A.3d 1130, 1134 (N.J. Super. Ct. 2019) (communications with the victim included threats to ruin the victim's life, business career, and reputation and to hurt her "in any way possible").

[89] *See State v. Whitesell*, 13 P.3d 887, 894 (Kan. 2000) (analyzing a statute which defined stalking as "an intentional, malicious, and repeated following or harassment of another person and making a credible threat *with intent* to place such person in reasonable fear for such person's safety,"); *State v. Rangel*, 977 P.2d 379, 380 (Or. 1999) (stalking conviction required that "[t]he person *knowingly* alarms or coerces another person or a member of that person's immediate family or household by engaging in repeated and unwanted contact with the other person,"); *State v. Martel*, 902 P.2d 14, 18  (Mont. 1995) (stalking statute required that person "*purposely or knowingly* cause[] another person substantial emotional distress or reasonable apprehension of bodily injury or death by repeatedly: following the stalking person; or harassing, threatening, or intimidating the stalked person, in person or by phone, by mail, or by other action, device, or method,"); *State v. Smith*, 709 N.E.2d 1245, 1249 (Ohio 1998) (statute provided that a person is guilty of stalking when they engage in a pattern of conduct which "*knowingly* cause[s] another to believe that the offender will cause physical harm to the other person or cause mental distress to the other person,"); *Peterson v. State*, 930 P.2d 414, 423 (Alaska 1996) (stalking defined as when a person "knowingly engages in a course of conduct that *recklessly* places another person in fear of death or physical injury, or in fear of the death or physical injury of a family member,"); *State v. Hill*, 307 A.3d 1157, 1172 (N.J. 2024) (rejecting an overbreadth challenge against a witness tampering

important. Those statutes, unlike Section 1312, applied states of mind of no less than recklessness to their result elements, which was an important factor in sustaining prosecution on an as-applied basis.[90]

On balance, components of the State's prosecution of Mr. Reeves may fall, in part, within the speech integral to criminal conduct exception.[91] The Statute, however, is not facially invalid simply because one or more of the potential component actions in a course of conduct may fit this exception.

### B. The true threats exception and the effect of *Counterman* are relevant to this facial challenge, but do not alone control the outcome.

Mr. Reeves focuses a significant portion of his facial argument on an enumerated exception also. He contends that the Statute is invalid because (1) Section 1312 permits prosecutions for threats, (2) the State can only lawfully prosecute a defendant for threat-based actions if they rise to the level of "true threats," and (3) Section 1312 runs afoul of *Counterman*'s holding regarding true threats. Although the true threats exception has a significantly broader range of

---

statute, but finding the statute unconstitutional as-applied to the defendant because the State was not required to prove that the defendant's speech was *intended* to interfere with or prevent the witness's testimony); *U.S. v Matusiewicz*, 84 F. Supp. 3d 363, 366 (D. Del. 2015) (stalking statute required that person have "the *intent* to kill, injure, harass, or intimidate another person").

[90] *See Martel*, 902 P.2d at 19-20 (explaining that the requirement of a mental state in order to violate a criminal statute may "avoid those consequences to the accused which may otherwise render a … statute invalid,"); *Rangel*, 977 P.2d at 386 (explaining in the court's adoption of a narrowing construction in order to avoid overbreadth that, "we conclude that under [the stalking statute], a contact based on communication must consist of a threat that convincingly expresses to the addressee the intention that it will be carried out, and that the actor has the ability to do so,"); *Matusiewicz*, 84 F. Supp. 3d at 374 (explaining that constitutional concerns arising in cyberstalking statute are partially ameliorated by the statute's requirement that the accused actually intended a harmful effect.)

[91] For instance, the State charges Mr. Reeves with an act of intimidation. To the extent that speech was used to intimidate the alleged victim into not filing a complaint against him, that application may fall within the speech integral to criminal conduct exception. That crime, in turn, may qualify as a component act within Mr. Reeves' alleged course of conduct that amounts to stalking.

potential applications under the Statute than the speech integral to criminal conduct exception, Section 1312 does not criminalize only threats. Accordingly, any infirmity in the Statute that permits the unconstitutional prosecution of threats does not alone make the Statute invalid.

At the outset, Mr. Reeves correctly recognizes that the First Amendment prohibits prosecuting simple threats based solely upon the content of speech. A simple threat involving the content of speech, that does not rise to the level of a true threat, cannot be criminalized.[92] On the other hand, threatening conduct toward victims often raises significant safety concerns and is appropriately criminalized even when it involves a defendant's speech.[93]

The United States Supreme Court developed the true threats exception to cover statements where a speaker communicates her intent to commit an act of unlawful violence targeted at an individual or group.[94] To be a true threat, the speaker need not intend to actually carry out an act of violence, however.[95] Rather, what the statement conveys and its effect on the recipient makes it a true threat.[96] It is enough that the speaker knew that his words or conduct would illicit a fear of violence in the recipient.[97] The U.S. Supreme Court has explained that "[w]hen the statement is understood as a true threat, all the harms that have long made threats

---

[92] *See Virginia v. Black*, 538 U.S. 343, 359–60 (2003) (explaining that in order for speech to be characterized as a proscribable "true threat," the speaker must have meant "to communicate a serious expression of an intent to commit an act of unlawful violence.").

[93] *See id.* ("[A] prohibition on true threats protects individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur.").

[94] *Id.* at 359.

[95] *Id.*; *see also Elonis v. U.S.*, 575 U.S. 723, 733 (2015).

[96] *Black*, 538 U.S. at 359.

[97] *Id.*

unprotected naturally follow.[98]  True threats subject individuals to the "fear of violence and to the many kinds of disruption that fear engenders."[99]

Until recently, there was a federal circuit split over the proper test for defining a true threat.  Some courts applied the "reasonable listener" test.  They looked at the alleged threat "in the light of its entire factual context and decide[d] whether the *recipient* of the alleged threat could reasonably conclude that it expresses a determination or intent to injure presently or in the future."[100]  Other courts applied a "reasonable speaker" test.  Those courts looked instead to whether the defendant "intentionally make[s] a statement . . . wherein a reasonable person would foresee that the statement would be interpreted by *those to whom the maker communicates the statement* [to be an] expression of an intention to inflict bodily harm or to take the life of the [target]."[101]  The Delaware Supreme Court, when examining Delaware's terrorist threatening statute, declined to decide which test to adopt because it was unnecessary for its decision.[102]

Then, in *Counterman v. Colorado,* the United States Supreme Court resolved the split on First Amendment grounds.  It held that true threat prosecutions require a *mens rea* of at least recklessness.[103]  In *Counterman*, the defendant was charged under a Colorado stalking statute very similar to Section 1312.  Namely, the Colorado statute made it illegal to "[r]epeatedly… make [] any form of communication with another person" in "*a manner that would cause a reasonable person* to suffer serious emotional distress and does cause that person … to suffer

---

[98] *Counterman*, 600 U.S. at 75.

[99] *Id.* at 74.

[100] *Andrews v. State*, 930 A.2d 846, 851 (Del. 2007) (emphasis added) (quoting *U.S. v. Dinwiddie*, 76 F.3d 913, 925 (8th Cir. 1996)).

[101] *Id.* (emphasis added) (quoting *U.S. v. Kosma*, 951 F.2d 549, 556 (3d Cr. 1991)).

[102] *See Id*. (declining to adopt either test because Delaware's terroristic threatening statute required, *unlike the current version of Section 1312*, subjective intent to threaten).

[103] *Counterman*, 600 U.S. at 82.

serious emotional distress."[104] The Supreme Court considered whether the Colorado statute's use of a reasonable person standard for the result element of the crime met constitutional requirements and found that it did not.[105] It supported its holding by stressing the need to avoid possible chilling effects on speech.[106] The Court explained that the First Amendment requires the presence of a criminally culpable mental state – a *mens rea*.[107] Now, a defendant must have at least a reckless state of mind with regard to the result of his or her conduct.[108] That, as explained by the Court, is necessary to provide "breathing space for protected speech, without sacrificing too many of the benefits of enforcing laws against true threats."[109]

In applying *Counterman,* Section 1312 provides that a defendant must **act** knowingly. But, Section 1312 requires that **the result** of the defendant's actions cause a reasonable person to fear physical injury or suffer significant mental anguish. Nevertheless, the State contends that the result element requires that the person *knowingly* caused *a reasonable* victim to fear for his safety or suffer significant mental anguish or distress. A plain reading of the text contradicts that interpretation, however, because simply separating the elements of the offense drives the point. To be specific, Section 1312 defines stalking to be when a person (1) knowingly engages in a course of conduct (2) directed at a specific person, **and** (3) that conduct would cause a reasonable person to fear for her physical safety or suffer significant mental anguish or distress.[110] The first and third elements contained in Section 1312

---

[104] *Id.* at 70.
[105] *Id.*
[106] *Id*. at 75.
[107] *Id.*
[108] *Id.* at 79; *see also Elonis v. U.S.*, 575 U.S. 723, 740 (2015) (holding, eight years prior to *Counterman*, that a prosecution for a true threat cannot premise liability upon a negligent mental state).
[109] *Id.* at 82.
[110] 11 *Del. C.* § 1312.

have different state of mind requirements: knowingly taking *an action*, versus negligently causing *a result*.

The State relies on 11 *Del. C.* § 252 ("Section 252") when arguing that the Court should interpret the Statute so that a knowing state of mind applies to the result element of the offense.[111] Section 252 provides the following: "[w]hen a statute defining an offense prescribes the state of mind that is sufficient for the commission of the offense, *without distinguishing among the elements thereof*, the provision shall apply to all the elements of the offense, unless a contrary legislative purpose plainly appears."[112] Contrary to the State's argument, however, Section 1312 *distinguishes among its elements*. Namely, it applies a knowing requirement to a defendant's actions.[113] In contrast, it provides a different state of mind requirement – that of a reasonable person – to the effect or result of the defendant's stalking activity.[114] To that point, negligence is defined in the Code as follows:

> a person acts with negligence with respect to an element of an offense when the person fails to exercise the standard of care which a reasonable person would observe in the situation.[115]

---

[111] State's Resp. to Def.'s Mot. to Dismiss at 13.
[112] 11 *Del. C.* § 252 (emphasis added).
[113] *Id.*
[114] If the State prosecutes this case based upon a true threat theory, the *Counterman* decision will undoubtedly have an impact. For instance, Delaware's Pattern Criminal Jury instructions illustrates the potential for applications inconsistent with the *Counterman* decision. Namely, the pattern stalking instruction includes four elements: "(1) [d]efendant engaged in a course of conduct directed at a person; (2) [d]efendant's conduct would cause a reasonable person to fear physical injury to themself or another person; (3) [d]efendant's conduct caused fear or suffering; and (4) [d]efendant acted intentionally." Del. Super. P.J.I. Crim. § 11.1312(a)(1) (2010). The second element listed in the instruction, which tracks the Statute, applies a negligent state of mind to the result element. While this creates no problem when the content of speech is not at issue, in true threat situations, it will. As discussed below, only the General Assembly can fix these shortcomings.
[115] 11 *Del. C.* §231(d).

For this reason, the Statute's reference to a reasonable person unequivocally references negligence. Given that reference, the state of mind of negligence applies to the result element of the crime.

Independent of the Statute's use of two different states of mind, subsection (h) of Section 1312 also resolves the issue because it specifically addresses the result element of the crime. In that subsection, the General Assembly clarified its intent to not apply a knowing state of mind to the result element. Namely, it provides that"[i]n any prosecution under [Section 1312], it shall not be a defense that the perpetrator was not given *actual notice* that the course of conduct was unwanted; or that the perpetrator did not intend to cause the victim fear or other emotional distress." In other words, subsection (h) provides that neither intentional nor knowing (by use of the phrase "actual notice") conduct applies to the result element. In this way, subsection (h) directly forecloses the State's argument.

In summary, Section 1312 applies a negligent state of mind requirement to the result element. Post-*Counterman*, any application of the Statute to "true threats," will be unconstitutional under the First Amendment.

## C. The Statute is not facially invalid because the unconstitutional applications of Section 1312 do not significantly outnumber its constitutional applications.

It is impossible to determine whether a statute reaches too far without first knowing what the statute covers.[116] Accordingly, the first step when addressing Mr. Reeves' facial challenge requires the Court to examine the challenged statute and identify the activities it prohibits.

---

[116] *Williams*, 553 U.S. at 293.

When reviewing a statute for constitutionality, "[t]here is a strong presumption that a legislative act is constitutional."[117] The person challenging the validity of the statute bears the burden of overcoming that presumption.[118] This presumption requires courts to exercise significant self-restraint.[119] Furthermore, Delaware mandatory authority imposes upon the Court the "duty to read statutory language so as to avoid constitutional questionability."[120] To the extent there are reasonable doubts as to the validity of a law, those doubts must be resolved in favor of the constitutionality of the legislation.[121] It is with this guidance in mind that the Court performs the necessary inquires.

In 2008, the General Assembly passed the current version of the Statute.[122] When doing so, it modified Section 1312 in several significant ways from prior versions. The Statute, as currently comprised, demonstrates the General Assembly's intent to broaden its sweep significantly. According to the Bill's synopsis, these changes were, in part, made to "enhance[] the stalking statutes[] of the Delaware Code to better protect Delaware citizens."[123] Because the Court must focus entirely on the Statute's text in a facial challenge, that text bears repeating. Again, it provides:

> [a] person is guilty of stalking when the person knowingly engages in a *course of conduct* directed at a specific person and that conduct would cause a reasonable person to: (1) [f]ear physical injury to himself or that of another person; or (2) [s]uffer other significant mental anguish or

---

[117] *Crumps v. State*, 285 A.3d 125, 2022 WL 4543823, at *1 (Del. 2022) (TABLE).
[118] *Wilmington Med. Ctr., Inc. v. Bradford*, 382 A.2d 1338, 1342 (Del. 1978).
[119] *Crumps*, 285 A.3d 125, 2022 WL 4543823, at *1 (citations omitted).
[120] *Hoover v. State*, 958 A.2d 816, 821 (Del. 2008) (quoting *State v. Sailer*, 684 A.2d 1247, 1250 (Del. Super. Sept. 13, 1995)).
[121] *Hoover*, 958 A.2d at 821 (quoting *McDade v. State*, 693 A.2d 1062, 1065 (Del. 1997)).
[122] Senate Bill No. 253 (May 7, 2008).
[123] Synopsis, Senate Bill No. 253 (May 7, 2008).

distress that may, but does not necessarily, require medical or other professional treatment or counseling.[124]

The Statute then defines a "course of conduct" as:

> 3 or more separate incidents, including, but not limited to, acts in which the person directly, indirectly, or through third parties, by any action, method, or means, follows, monitors, observes, surveys, *threatens, or communicates to or about another*, or interferes with, jeopardizes, damages, or disrupts another's daily activities, property, employment, business, career, education, or medical care.[125]

This 2008 revision continued the trend of expanding the scope of the conduct prohibited by Delaware's stalking law from its original form in 1992 through the present.[126] The current version reduced the requisite *mens rea* applicable to a defendant's acts from intentional to knowing.[127] Furthermore, the Statute no longer

---

[124] 11 *Del. C.* § 1312 (emphasis added).

[125] *Id.*

[126] In 1992, a prosecution for stalking specifically required not only that the defendant "willfully, maliciously, and repeatedly" engaged in the proscribed conduct, but that the defendant did so "*with the intent* to place that person in reasonable fear of death or serious physical injury." 68 *Del. Laws*, c. 250 § 1 (1992) (defining stalking as when a person "willfully, maliciously, and repeatedly follows or harasses another person or ... repeatedly makes a credible threat with the intent to place that person in reasonable fear of death or serious physical injury"). In 1996, the statute was amended to premise criminal liability on the effect on a reasonable person, but threats were the only expressive conduct included in the definition of a "course of conduct." 70 *Del. Laws*, c. 316 § 1 (1996) (defining stalking as "intentionally engag[ing] in a course of conduct directed at a specific person which would cause a reasonable person to fear physical injury to him or herself … or to a third person and whose conduct induces such fear[.]"). When the General Assembly amended the statute again in 2003, it no longer required that the victim be aware of the fact that they were being stalked, it added a prohibition against a course of conduct which threatens the victim's property or employment, and it included an additional provision which enhanced the criminal penalty in cases where the conduct caused fear, included a threat of death or serious physical injury, or involved the use of a deadly weapon. 74 *Del. Laws*, c. 116 § 1 (2003) (defining stalking as when a person "intentionally engages in a course of conduct directed at a specific person which would cause a reasonable person to (i) [f]ear physical injury to himself or herself, to a friend or associate, or to a member of his or her household or to a third person, (ii) [f]ear damage to property owned by himself or herself, to a friend or associate, or to a member of his or her household or to a third person, or [f]ear that his or her employment, business or career is threatened…").

[127] *Compare* Section § 1312 (premising criminal liability on whether an accused individual "*knowingly* engages in a course of conduct…") *with* 74 *Del. Laws*, c. 116 § 1 (2003) (premising

28

includes a result element that requires an accused's behavior to *actually* result in a victim's fear of physical injury to or significant mental anguish or distress.[128] Presently, the statute requires only that the conduct would produce that result in a "reasonable person."[129]

Additionally, Section 1312, in current form, broadens the definition of a "course of conduct" to incidents when an individual "threatens, or communicates to or about another [person]" on three or more separate occasions. Under the present version, knowingly expressly applies to threats, communications, or other enumerated actions. But, as explained above, the Statute's result element requires the State to prove merely that the effect of the threat or communication would have caused a **reasonable person** to fear for her physical safety, the safety of another person, or to experience significant mental anguish or distress.

Turning to the threshold inquiry in this facial analysis, the Court must determine whether Section 1312 criminalizes speech based upon content. The Statute's use of the phrase "communicates to or about another" singularly answers the question. It criminalizes speech based upon content to some extent because the Statute applies to any communication that reasonably results in "significant mental anguish or distress."[130] Likewise, the Statute's reference to "threatens," necessarily

---

criminal liability on whether an accused individual "*intentionally* engage[d] in a course of conduct…").

[128] *Compare* 74 *Del. Laws*, c. 116 § 1 (2003) (requiring only that the conduct would cause a reasonable person to fear physical injury to him or herself or another person; to fear damage to property owned by him or herself or a third person; or fear damage to his or her employment, business, or career ) *with* 70 *Del. Laws*, c. 316 § 1 (1996) (requiring that an individual's conduct would not only cause a reasonable person to fear for their physical safety, but also that their conduct "induces such fear in such person".).

[129] 11 *Del. C.* § 1312.

[130] 11 *Del. C.* § 1312 (a).

implicates threats, which often requires a trier of fact to consider the content of threatening speech.[131]

Mr. Reeves correctly identifies several circumstances where Section 1312 permits prosecution based upon the content of a defendant's speech.[132] First, he argues that "threatens" is not limited to unprotected "true threats."[133] He correctly recognizes that possible interpretations of "threatens," could include examples such as "threaten[ing] divorce, threaten[ing] to take custody of the children, threaten[ing] to exploit, threaten[ing] to accuse of a crime, [or] threaten[ing] to steal."[134] Mr. Reeves correctly recognizes that the Statute infringes upon protected speech because the word "threatens" is left open to such a broad interpretation.[135]

Mr. Reeves also correctly contends that the definition of "course of conduct" sweeps in protected speech with its inclusion of the terms "communicates to, or about," without including a mechanism to protect the content of the speech.[136] Additionally, he correctly asserts that the phrase "including, but not limited to" expands the potential unconstitutional applications of the Statue.[137]

When applying these problems in context, the Statute would enable the prosecution of a doctor who tells a patient on at least three occasions that, although

---

[131] *See Mashaud,* 295 A.3d at 1156 (explaining in the court's analysis of the facial validity of D.C.'s stalking statute that it is necessary to look at the content of the statute itself to determine whether the communication would cause a reasonable person to suffer emotional distress creates a content-based restriction).

[132] *See* Def.'s Suppl. Br. In Supp. Of Mot. to Dismiss at 7–10; *see also People v. Releford*, 104 N.E.3d 341, 356 (Ill. 2017) (noting that the Illinois stalking statute, with very similar language to Delaware's stalking statute, may impermissibly "prohibit[] a person from attending town meetings at which he or she repeatedly complains about pollution caused by a local business owner and advocates for a boycott of the business" if that person "knows or should know that the complaints will cause the business owner to suffer emotional distress due to the economic impact of a possible boycott.").

[133] Def.'s Mot. to Dismiss ¶ 22.

[134] *Id.* ¶ 14.

[135] *Id.*

[136] *Id.* ¶ 12.

[137] *Id.* ¶ 13.

an operation may be necessary to save the patient's life, the effect of the operation will cause accompanying physical pain or injury. Likewise, the Statute would criminalize three complaints by a restaurant's customer on social media about poor service at the restaurant, that in turn, causes the owner severe mental anguish because his business failed as a result. The Statute would also criminalize when a person posts critical comments about another, at least three times, on social media when those comments would reasonably cause significant mental distress to another. These contextual examples and many others demonstrate that Section 1312 criminalizes the content of speech and is overbroad. As a result, the first inquiry is answered in the affirmative.

Step two and three of the analysis are appropriately combined. Together, they require the Court to determine whether the Statute's criminalization of protected speech is "substantial" in relation to its "plainly legitimate sweep."[138] The result of these combined inquiries determines whether a law is facially invalid or whether speech related prosecutions must be considered on a case-by-case basis.

The Supreme Court in *Broadrick v. Oklahoma first* articulated the substantialness test for overbreadth.[139] There, the Court imposed the requirement that when a statute is directed at both conduct and speech, the overbreadth must be "substantial" to make a statute facially invalid.[140] The author of a dissenting opinion in *Broadrick* identified the challenges in deciding where to draw the line between the substantial and unsubstantial as follows:

> it is obviously difficult to estimate the probable impact of today's decision. If the requirement of 'substantial' overbreadth is construed to mean only that facial review is inappropriate where the likelihood of an impermissible application of the statute is too small to generate a 'chilling effect' on protect speech or conduct, then the impact is likely

---

[138] *Broadrick*, 413 U.S. at 615–616.
[139] *Id.*
[140] *Id.*

to be small. On the other hand, if today's decision necessitates the drawing of artificial distinctions between protected speech and protected conduct, and if the 'chill' on protected conduct is rarely, if ever, found sufficient to require the facial invalidation of an overbroad statute, then the effect could be very grave indeed.[141]

Following the *Broadrick* decision, the Supreme Court began limiting the reach of facial challenges by requiring that a statute's overbreadth "be substantial, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep."[142] Next, in *U.S. v. Williams*, the Supreme Court limited the doctrine further by recognizing that invalidating a statute based upon overbreadth is "strong medicine," and by directing courts to not causally employ it.[143] Most recently, in *United States v. Hansen*,[144] the Supreme Court articulated the following test:

> [t]o justify facial invalidation, a law's unconstitutional applications must be realistic, not fanciful, and their number must be *substantially disproportionate* to the statute's lawful sweep. *In the absence of a lopsided ratio, courts must handle unconstitutional applications as they usually do – case-by-case*.[145]

Accordingly, the substantial overbreadth test distills to the question of whether there is a lopsided ratio in favor of unconstitutional applications. A statute, although overbroad, becomes facially invalid only in the face of such a lopsided ratio.

Tallying the Statute's potential applications and then separating them into the constitutional and unconstitutional is the next step. Section 1312 has many constitutional applications. As referenced above, Section 1312 permissibly criminalizes a broad range of criminal *conduct* that fits firmly within the common and ordinary definition of stalking. It permits prosecutions based upon acts that

---

[141] *Id*. at 632–633 (Brennan, J., dissenting).
[142] *Williams*, 553 U.S at 292.
[143] *Id.* at 293.
[144] 599 U.S. 762 (2023).
[145] *Hansen,* 599 U.S. at 770 (citations omitted).

cause physical injury, fear, or significant emotional distress.[146]  Furthermore, when focusing on threats and communications more granularly, there are many legitimate applications to speech and communication where the content of that speech or communication is irrelevant.  Likewise, repeated violations of no contact orders by a defendant who communicates with a victim do not necessarily trigger First Amendment analysis.  There, the contact itself, apart from the content of the speech, may be all that is relevant.   As the State correctly asserts, there are legitimate potential prosecutions that fall under the speech integral to criminal conduct exception as well.

Moreover, Section 1312's application to significant swaths of *conduct* that do not implicate the First Amendment deserves more emphasis.  For instance, the Statute permissibly criminalizes combinations of actions including spying on, interfering with, and surveying a victim.  The Statute also permits the State to prosecute a defendant for a combination of acts that could include following a victim, lurking outside his home, and calling and hanging up on him when doing so.  On balance,  given the broad definition of a "course of conduct," the Statute provides many possible applications that do not implicate the First Amendment.

On the other side of the ratio, the Statute permits a significant number of unconstitutional applications to balance against the constitutional ones.  At the outset, the post-*Counterman* infirmity in true-threat prosecutions create a significant number of unconstitutional applications. True threat prosecutions should be, and are, a significant focus of Section 1312.  In fact, in some cases, threats that are relayed through speech are the essence of stalking.   This infirmity increases the tally on the unconstitutional side of the ratio.

---

[146] 11 *Del. C.* § 1312.

Likewise, as written, the Statute permits the prosecution of mere threats based upon the content of speech, which, when they do not rise to the level of "true," automatically falls short of First Amendment protections. The Statute also unconstitutionally criminalizes a broad range of speech by including the phrase "communicates to or about" within the definition of a course of conduct while providing no mechanism to exclude illegitimate prosecutions.

After tallying and comparing the columns of the legitimate and the illegitimate, the Statute is not substantially overbroad. A significant number of legitimate applications, balanced against a significant, but not all-encompassing, number of unconstitutional applications does not net a lopsided ratio in favor of the unconstitutional. Accordingly, the Statute is not facially invalid. The Court must therefore determine whether the State proceeds constitutionally against Mr. Reeves by considering the evidence presented at trial.[147]

The Court next turns to Mr. Reeves suggestion that the Court judicially revise the Statute to cure a large number of its constitutional infirmities. This requires the Court to consider whether it should sever the words "threatens, communicates to or about" from the Statute.

At the outset, the Court declines to sever the provision because it is inappropriate to do so given the Statute's facial validity. Nevertheless, the Court acknowledges authority in some jurisdictions where courts addressed infirmities in their stalking statutes by striking the offending terms.[148] The Delaware Supreme

---

[147] This reveals the very thorny issue of a jury's potential involvement in a fact-finding process that contributes to such a determination. A significant practical difficulty in determining these matters on an as-applied is to what extent it may require findings of fact from the trier of fact. This, and other complications, would be significantly ameliorated if the Statute were to be amended to remedy the significant number of unconstitutional applications.

[148] *See Mashaud*, 295 A.3d at 1160 (discussing a savings clause which provides that the stalking statute should not be read to apply to constitutionally protected speech); *See also Relerford*, 104 N.E.3d at 356 (stating that the bill which added the "communicates to or about" language to the stalking statute specifically provided that its provisions were severable pursuant to Illinois law).

Court has explained the standard for striking unconstitutional terms from a statute as follows:

> [w]here a statute, regulation, or state action faces a constitutional challenge, 'a Court may preserve its valid portions if the offending language can lawfully be severed.' But where it is evident that the remaining provisions would not have been enacted without the unconstitutional provision, a court should invalidate the entire provision.[149]

Assuming only in the alternative that the Court should perform a severability analysis despite the Statute's facial validity, the result stays the same and the Statute would stay intact. Namely, striking the primary offending provision would be inappropriate for two reasons. First, the General Assembly did not clarify its intent that the Court should do so. Second, the Statute's legislative history demonstrates that the General Assembly would not have enacted the Statute without the primary offending provision.

Initially, the bill enacted into law did not contain an intrinsic severability clause to signal the General Assembly's intent for the Court to judicially revise the Statute in these circumstances.[150] Granted, although the General Assembly did not include an express severability provision, there is a general severability provision in the Delaware Code. The general severability provision, 1 *Del. C.* § 308 ("Section 308") provides:

> [i]f any provision of this Code or amendments hereto, or the application thereof to any person, thing or circumstances is held invalid, such invalidity shall not affect the provisions or application of this Code or such amendments that can be given effect without the invalid provisions or application, and to this end the provisions of this Code and such amendments are declared to be severable.

---

[149] *Doe v. Wilmington Housing Authority*, 88 A.3d 654, 669 (Del. 2014).
[150]

While the Court must give effect to the General Assembly's valid enactments, there is a marked difference between applying this general provision and applying a built-in severability provision in the challenged law.   Namely,  the General Assembly passed Section 308  in 1953.   It passed Section 1312 in its current form in 2008.[151]  It is axiomatic that one legislative body (here one General Assembly) cannot bind a future one absent the enactment of a constitutional amendment.[152] While one could reasonably submit that the General Assembly is aware of existing statutes when enacting new laws, the General Assembly's frequent use of intrinsic severability provisions in legislation demonstrates the opposite.[153]  Here, the General Assembly did not include an intrinsic severability provision with Section 1312.  That cuts against a finding of legislative intent that the Court should sever the primary offending provision from the Statute.

Even if Section 308 controls, severing the phrase "threatens, communicates to or about" from the Statute would be inappropriate.  Courts have frequently observed that excessive judicial revision of an overbroad statute in the First Amendment context often creates future vagueness problems.[154]  Were the Court in this case to remove what is a centerpiece of the definition of a course of conduct , it would (1) defeat many lawful purposes of the Statute, and (2) leave the Statute riddled with

---

[151] Senate Bill No. 253 (May 7, 2008).

[152] *See Ohio Life Ins. & Trust Co. v. Debolt*, 57 U.S. 416, 431 (1853) ("[N]o one legislature can, by its own act, disarm their successors of any powers or rights of sovereignty confided by the people to the legislative body, unless they are authorized to do so by the constitution under which they are elected."); *see also Glassco v. Cnty.  Council of Sussex Cnty.*, 1993 WL 50287, at *5 (Del. Ch. 1993).

[153] MARK J. CUTRONA, LEGIS. COUNCIL DIV. OF RSCH., DEL. LEGIS. DRAFTING MANUAL 41 (Holly Vaughn Wagner ed., 4th ed. 2022) (noting that the best drafting practice is to "include a specific severability clause within a bill when it is deemed necessary, as this is a clearer expression of legislative intent than simply relying on § 308.").

[154] *See e.g., People v. Marquan M.,* 19 N.E.3d 480, 487 (N.Y. 2014) (noting that excessive judicial revision of an overbroad statute may lead to vagueness problems when "the statutory language would signify one thing but, as a matter of judicial decision, would stand for something entirely different.").

36

vagueness. That vagueness, in turn, would cause new difficulties unless remedied through further judicial revision by adding new terms to the Statute. To do the latter would violate the separation of powers doctrine in all but the most unusual of cases.

Moreover, the primary offending provision permits many legitimate applications that the General Assembly would not have done without. Striking the provision, would in effect, throw the baby out with the bath water. For instance, the term threatens and the phrase referencing communications legitimately address criminal activity that the General Assembly demonstrated its intent to criminalize. Section 1312's stated intent, via the synopsis, was to markedly expand the law into the very areas that the primary offending provision addresses. Furthermore, without the Statute's threatens component, the State would be unable to prosecute a stalker who by other actions, means, or devices intimidates, follows, or trespasses upon a victim. In fact, conduct such as this is *so central* to a stalking law that the General Assembly has included the terms threat, threats, or threatens in every version of Delaware's stalking statute since its first enacted one in 1992.[155]

Finally, judicially severing and invalidating only one part of the primary offending provision, namely by striking the phrase "communicates to, or about," would be an exercise of inappropriate judicial legislating. To do so, the Court would need to make a qualitative decision to favor one partially unconstitutional provision over another – both component parts of the provision will have constitutional infirmities in certain applications. On balance, the General Assembly would not have enacted the Statute without the primary offending provision as it stands. For

---

[155] *See* 68 *Del. Laws*, c. 250 § 1 (1992) (including "repeatedly makes a credible threat" within the list of proscribed activities); 70 *Del. Laws*, c. 316 § 1 (1996) (including "repeatedly conveying verbal or written threats" in the definition of a "course of conduct"); 74 *Del. Laws*, c. 116 § 1 (2003) (expanding the statute's scope to include threats which would cause a reasonable person to fear harm to their property, employment, business, or career in addition to threats to physical safety).

these reasons, neither severing the entire provision, nor severing one of its component parts, would be appropriate.

In summary, Section 1312 criminalizes conduct and speech. When considering the Statute's many lawful applications versus the unlawful, the balance does not lopsidedly fall in favor of the unconstitutional. Nor is severance of the phrase "threatens, communicates to or about" appropriate because (1) the Statute, as a whole, is facially valid, and (2) the General Assembly would not have passed Section 1312 without the provision. Here, any disagreements regarding the constitutionality of Mr. Reeves' prosecution must be resolved with evidentiary context, on an as-applied basis.

## IV.    CONCLUSION

For the reasons explained above, Delaware's stalking statute is overbroad, but not facially invalid. Mr. Reeves' motion to dismiss the stalking charge on a facial basis is therefore denied. His challenges to the unconstitutionality of his prosecution must await evidentiary context.